*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0252P (6th Cir.)
File Name: 03a0252p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DOUGLAS THOMAS,
  *Plaintiff-Appellant,*

  *v.*                          No. 01-3227

SHAWN WOOLUM,
  *Defendant,*

RICHARD KEPLER;
CHARLOTTE STARCHER;
BILLIE WADDELL, SR.,
  *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-01120—James L. Graham, District Judge.

Argued: August 6, 2002

Decided and Filed: July 28, 2003

Before: MOORE and GILMAN, Circuit Judges; ROSEN,
District Judge.[*]

_____

## COUNSEL

**ARGUED:** Alphonse A. Gerhardstein, LAUFMAN &
GERHARDSTEIN, Cincinnati, Ohio, for Appellant. Todd R.
Marti, OFFICE OF THE ATTORNEY GENERAL,
CORRECTIONS LITIGATION SECTION, Columbus, Ohio,
for Appellee. **ON BRIEF:** Alphonse A. Gerhardstein, Paul
M. Laufman, LAUFMAN & GERHARDSTEIN, Cincinnati,
Ohio, for Appellant. Todd R. Marti, OFFICE OF THE
ATTORNEY GENERAL, CORRECTIONS LITIGATION
SECTION, Columbus, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court. GILMAN,
J. (pp. 25-27), delivered a separate concurring opinion.
ROSEN, D. J. (pp. 28-66), delivered a separate opinion
dissenting in part and concurring in the judgment.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Congress's
passage of the Prison Litigation Reform Act ("PLRA") was
an attempt to curb rampant prison litigation in the federal
courts, but its enactment did not erode the role of the federal
courts as vindicators of federal rights. The PLRA explicitly
requires an inmate seeking to challenge prison conditions in
federal court to exhaust any available administrative
remedies, but the statute's text does not condition access to
the federal courts on satisfying the procedures and timelines

_____

[*]The Honorable Gerald E. Rosen, United States District Judge for the
Eastern District of Michigan, sitting by designation.

of prison administrators. Thus, this case turns not on *whether* exhaustion is required, the answer to which is well settled, but on *what* exhaustion requires. We answer that question in light of Congress's purpose in passing the PLRA and Supreme Court precedent regarding the exhaustion doctrine's oft-stated purpose: to give prison officials the first opportunity to address inmate complaints according to their rules and procedures without letting those timetables dictate the outcomes of § 1983 actions. Accordingly, we hold that so long as an inmate presents his or her grievance to prison officials and appeals through the available procedures, the inmate has exhausted his or her administrative remedies, and a prison's decision not to address the grievance because it was untimely under prison rules shall not bar the federal suit. We also hold, however, that when a grievance does not give prison officials notice of the nature of the inmate's complaint, the inmate has not met the PLRA's requirements. We thus **AFFIRM** the judgment of the district court.

## I. BACKGROUND

When inmate Douglas Thomas told a supervising officer at the North Central Correctional Institution ("NCCI") that he felt stressed out and needed "to lay it down for a few days," the officer instructed Corrections Officer Shawn Woolum to take Thomas down to the segregation unit. J.A. at 84 (Springer Incident Rep.). Woolum, with whom Thomas had exchanged angry words earlier that day, took the opportunity to retaliate. While walking Thomas down to segregation, Woolum instructed another inmate who was present to leave and began to pummel the handcuffed Thomas. Woolum struck Thomas from behind, slammed him into a steel door, and banged his face against the steel door and cement walls. Upon their arrival at the holding cell, Woolum slammed Thomas into a steel doorframe, picked him up, and slammed his face and head again into a cement wall. Woolum then stomped on Thomas's foot. Thomas was in handcuffs during the relevant time and did not resist. As a result of Woolum's actions, Thomas suffered a broken clavicle, broken ribs, a

broken foot, facial lacerations, and massive swelling. Thomas alleges that Officers Richard Kepler, Charlotte Starcher, and Billie Waddell, Sr. observed the beating, but they failed to intervene. That was on November 5, 1997.

Various investigations followed. Officers Woolum, Kepler, and Waddell, along with the supervising officer who had suggested Thomas go to segregation and the nurse who treated Thomas's injuries, filed "incident reports," as prison regulations require when an employee struggles with an inmate or observes such a struggle. Ohio Admin. Code § 5120-9-02(A)-(B) (1997). Thomas also filed a voluntary statement the day after the incident, in which he described what had happened and noted, "At some point when I was being beaten while wearing handcuffs I seen officers looking but the only on[e] I knew was Bill[ie] Waddell." J.A. at 153.

In accord with regulations, prison officials then formed a Use of Force Committee to investigate the incident. Having heard additional statements, including another statement from Thomas describing Woolum's actions, the Use of Force Committee issued a report concluding that Woolum had used an inappropriate amount of force; after disciplinary proceedings some time later, Woolum was fired. Under the administrative code, however, the inmate has no right to view the report or the evidence used to create it.

In addition to the prison's internal administrative inquiry, Thomas invoked the formal grievance procedure. After being transferred to the Allen Correctional Institution ("ACI"), on May 1, 1998, Thomas requested a grievance form in order to report the November 5 incident. On or about May 4, 1998, Thomas filed a Notification of Grievance with NCCI's institutional inspector. The Notification of Grievance form requires the prisoner to state "[t]he nature of the Grievance" in specific terms. Thomas stated, in part, as follows:

> [O]n Nov. 5th while I was at NCCI I was assaulted by [Corrections Officer] Woolum while I was in handcuffs

and I had several bones broken and have since been transferred to A.C.I. administratively. Also as you know the state troopers & the FBI have conducted investigations. . . . The Prison[] Litigation Reform Act & Title 42 of the United States Code require[] that a prisoner must exhaust state remedies prior to litigation. Therefore I ask that [Corrections Officer] Woolum be removed and released from his employment with the Department of Corrections and that I am awarded 5 million dollars.

J.A. at 33. The institutional inspector denied relief, apparently because the grievance was not filed within the thirty-day period required by Department of Rehabilitation and Correction ("Department") policy.

Thomas pursued his grievance. Following the initial denial, Thomas appealed to the Chief Inspector. Thomas argued that the ACI law library had been provided copies of Department policy manuals only in the last thirty to forty-five days, that the thirty-day time limit was a recent change in policy, and that prisoners had not been notified of the change in policy. On October 30, 1998, the Chief Inspector denied Thomas relief, determining that the grievance was filed too late and that information regarding the Department's new time-limit policy was available in the law library. Accordingly, the decision of the Chief Inspector stated, "This Office will take no further action in regard to your complaint at this time." J.A. at 35.

Thomas filed a complaint in state court on November 5, 1998, against Woolum and John Does and Jane Does, alleging that Woolum applied excessive force and that the John Does and Jane Does failed to protect Thomas and prevent the beating. Thomas claims that during discovery for the state-court action, he learned that Kepler, Starcher, and Waddell were present during the beating and failed to protect him. Indeed, statements that officers had filed with their incident reports and the Use of Force investigation —

statements that Thomas had no right to access — indicated that other officers might have observed Woolum's actions and not intervened. Thomas learned through these documents, for example, that Officer Kepler "heard a loud noise coming from the sallyport" and "exited the R.I.B. office to investigate," J.A. at 88; that Officer Waddell "walked into the hall [when] Thomas was being put in a holding cell," J.A. at 89, which meant that, according to the Use of Force Committee's conclusions, Waddell might have watched Thomas being pushed in a way that caused his head to strike the wall; and that Officer Starcher admitted having seen Thomas in the holding cell. From these newly available statements, Thomas appears to have concluded that these three officers may have witnessed Woolum's assault.

The state court action against Woolum and the John Does and Jane Does was then dismissed without prejudice on October 20, 1999, and Thomas filed the original complaint in U.S. District Court on October 22, 1999. This time, Thomas sued not John Does and Jane Does, but armed with the information obtained in state court discovery, instead sued Woolum, Kepler, Starcher, and Waddell. After briefing, the district court ruled that Thomas had not exhausted his remedies with respect to Kepler, Starcher, and Waddell. Thomas's grievance form, the District Court reasoned, was "against defendant Woolum," not the other defendants, J.A. at 114, so although the court eventually awarded Thomas $70,000 on his claim against Woolum, it dismissed his claims against Kepler, Starcher, and Waddell for failure to exhaust.

Thomas appealed the dismissal of his claims against the other defendants. The defendants now offer two ways in which Thomas failed to exhaust his remedies against Kepler, Starcher, and Waddell: (1) that we may not look at Thomas's state prison grievance at all, and (2) that his grievance was insufficient to exhaust his claims. First, the defendants argue that Thomas failed to exhaust his administrative remedies because he did not file his grievance regarding the November 5, 1997 beating until May of 1998, after the thirty-

day period in which the Department will accept grievances had expired. Second, they argue that his grievance was not "against" them, but against Woolum alone, and that he could not bring a suit against them. We review de novo any legal determinations made in dismissing a complaint for lack of subject matter jurisdiction, including a determination that the plaintiff did not exhaust administrative remedies, and we review any factual findings for clear error. *See Cathedral Rock of North College Hill, Inc. v. Shalala*, 223 F.3d 354, 358 (6th Cir. 2000). We begin with the defendants' first argument, for before we may determine whether Thomas's grievance was sufficient, it is necessary for us to determine whether we may look at his grievance at all.

## II. COMPLIANCE WITH STATE PROCEDURAL REQUIREMENTS

The Prison Litigation Reform Act prohibits inmates from challenging prison conditions in federal courts until they have exhausted their available administrative remedies. 42 U.S.C. § 1997e(a). There is no doubt that under the PLRA, exhaustion by prisoners is mandatory. *See Booth v. Churner*, 532 U.S. 731, 739 (2001); *see also Page v. Torrey*, 201 F.3d 1136, 1139 (9th Cir. 1999) (recognizing that exhaustion requirement applies only to those who are "currently detained," not former prisoners, and noting agreement of the Second, Seventh, and Eighth Circuits). The exhaustion requirement ensures that state prison systems will have an opportunity to handle prison grievances internally before recourse to the federal courts becomes available. But exhaustion is not the same as procedural default, and in similar state administrative contexts, the Supreme Court has held that state timelines cannot foreclose access to the federal courts when a petitioner has exhausted his or her state administrative remedies by bringing a grievance to the state and pursuing that grievance through to the administrative agency's final ruling. That is, the exhaustion requirement is a "termination" requirement, requiring a petitioner to pursue administrative remedies as far as they exist. So long as a

prisoner meets this requirement, a federal claim will not be barred by the plaintiff's failure to comply with a state prison's internal procedural requirements.

### A. Exhaustion and the PLRA

By requiring prisoners who challenge the conditions of their confinement to exhaust first their state administrative remedies, the PLRA grants state prison systems the initial opportunity to address their internal problems. Whereas parts of the PLRA aim to ease the burden that meritless prisoner lawsuits impose on state law-enforcement officials and the federal docket, *see, e.g.*, 42 U.S.C. § 1997e(c)(1) (permitting court to dismiss sua sponte prisoner suits that are obviously frivolous); *id.* § 1997e(f) (authorizing pretrial hearings via telephone or videoconference rather than in-person appearance of the prisoner); *id.* § 1997e(g)(1) (permitting defendant to waive the right to reply to prisoner actions), nothing suggests that a goal of the act, and specifically, of the exhaustion requirement, was to defeat valid constitutional claims. Rather, the exhaustion requirement simply recognizes that unless a prisoner first presents his or her grievance to the state prison system, what will often be the most efficient mechanism to remedy a violation of federal law will be lost. *See Porter v. Nussle*, 534 U.S. 516, 525 (2002) ("Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."). The exhaustion requirement is therefore a benefit accorded to state prisons, an opportunity to satisfy those inmate grievances the state wishes to handle internally. *See Preiser v. Rodriguez*, 411 U.S. 475, 492 (1973) ("Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems."). It is "an accommodation of our federal system designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971). It is not, however, designed to permit state administrative

timelines to handcuff the federal courts in adjudicating cases involving important federal rights. Accordingly, the PLRA does not contain any language regarding the timeliness of grievance filings or the application of procedural default; if the state forgoes an opportunity to decide matters internally whether for internal time constraints or any other reason, the PLRA has nonetheless served its purpose, and the prisoner may proceed to federal court.

Because the purpose of the exhaustion requirement is to provide states the first opportunity to resolve problems themselves, an inmate who has not pursued available administrative remedies may not yet proceed in federal court. Thus, we have clearly held that an inmate does not exhaust available administrative remedies when the inmate entirely fails to invoke the prison's grievance procedure, *see Hartsfield v. Vidor*, 199 F.3d 305, 308-09 (6th Cir. 1999); *Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir.), *cert. denied*, 525 U.S. 833 (1998), or when the inmate filed such a grievance but "did not appeal the denial of that complaint to the highest possible administrative level," *Wright v. Morris*, 111 F.3d 414, 417 n.3 (6th Cir.), *cert. denied*, 522 U.S. 906 (1997); *see also Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999). However, we have not previously ruled in a published opinion[1] that an inmate fails to exhaust his or her available administrative remedies when the inmate invokes the prison's grievance system initially and appeals the denial of that grievance, but is time barred by the prison's administrative procedures.

---

[1]We have rendered two unpublished orders in which we held that the exhaustion requirement was not met because of a failure to meet a state's procedural deadlines. However, these unpublished orders have no precedential value and do not bind this panel. *Jacobs v. Wilkinson*, No. 00-3212, 2001 WL 1298979 (6th Cir. Aug. 8, 2001) (Unpub. Order); *Qawi v. Stegall*, No. 98-2402, 2000 WL 571919 (6th Cir. May 3, 2000) (Unpub. Order).

Our precedent demonstrates only that, in keeping with the plain language of § 1997e(a), a prisoner does not exhaust his administrative remedies when he fails to commence the grievance process or to run the gamut of potential appeals. In *Hartsfield,* we dismissed a prisoner's § 1983 suit because the disappearance of the prisoner's grievance form, the lack of any evidence demonstrating that a grievance was actually filed, and the failure of the prisoner to refile a grievance did not support the argument that the prisoner ever began the grievance process. 199 F.3d at 308-09; *see also Jones v. Smith*, 266 F.3d 399, 400 (6th Cir. 2001) (affirming dismissal of § 1983 suit because plaintiff prisoner was not vigilant enough in obtaining a grievance form after his initial request for one was denied and because the prisoner never made "any other attempt to obtain a form or to file a grievance without a form"). In *Freeman*, the exhaustion requirement was not met because the prisoner jumped the gun, and despite making some attempts to follow the proper grievance procedures, filed a federal complaint before completing all of the stages of the internal grievance process. 196 F.3d at 645. In *Wright v. Morris*, one prisoner filed an initial grievance, but then failed to appeal the denial of this grievance through the entire process. 111 F.3d at 417 n.3; *see also Harper v. Jenkin*, 179 F.3d 1311, 1312 (11th Cir. 1999) (dismissing § 1983 claim because the inmate did not appeal the denial of the grievance, thus failing to give the state a full chance to hear the grievance). These cases thus address the situation in which the prisoner is attempting to "bypass the exhaustion requirement by declining to file administrative complaints and then claiming that administrative remedies are time-barred and thus not then available." *Wright*, 111 F.3d at 417 n.3.

Here, however, Thomas filed a grievance in the prison's formal grievance process, and once that grievance was denied, Thomas appealed as far as he could. He had quite literally exhausted his ability to go any further within the internal prison system. There were no more avenues to travel within the state prison system. If Thomas had failed to file, the state

prison system would never have had *any* opportunity to review the claim. However, by filing, Thomas gave the state an opportunity to hear the claim and, by appealing, Thomas gave the state the opportunity to reconsider its decision. Thomas received the benefit of the potential that the state would hear his grievance by waiving the procedural guidelines, which the state could have done if it wanted to avoid federal court. The state received the benefit of dealing with the case internally if it so desired. The defendants, however, argue that exhaustion also requires more, and specifically, that it requires compliance with state administrative deadlines. Yet such an outcome would extend our established precedent beyond its present boundaries.

## B. Exhaustion and State Procedural Rules

In two similar statutory contexts requiring resort to state administrative procedures, the Supreme Court has specifically held that a plaintiff's failure to comply with state statutes of limitations cannot prevent the plaintiff from proceeding to federal court.[2] Both the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964 require plaintiffs to present their grievances in the relevant state

---

[2] Analogizing the prison grievance system to other state administrative processes is more apt than analogizing it to the process of habeas relief. The Supreme Court has not placed any procedural default hurdles upon the congressionally mandated exhaustion requirements for Title VII and the ADEA, which are chiefly concerned with administrative grievances. Thus, simply because the Supreme Court has crafted a procedural default rule in the habeas corpus context to shore up potential end-runs around the exhaustion requirement does not justify extending procedural default outside of the sphere of criminal law. There are key distinctions between the administrative grievance process and the habeas process that warrant disparate applications of a procedural default requirement. The notions of comity that prevent federal courts from unduly interfering with the state criminal judicial process in the habeas context do not have precisely the same resonance and intensity when federal courts are analyzing the outcome of a non-criminal state administrative process and when § 1983 interposes the federal courts as a vindicator of federal rights.

system before the plaintiff may initiate a federal suit. *See* 29 U.S.C. § 633(b) (ADEA); 42 U.S.C. § 2000e-5(c) (Title VII). In *Oscar Mayer & Co. v. Evans*, 441 U.S. 750 (1979), the Supreme Court held that an ADEA plaintiff who had presented his grievance to the governing state agency after the state's statute of limitations had expired had nonetheless satisfied the ADEA's requirements and could proceed with his federal suit. *See Oscar Mayer*, 441 U.S. at 753 ("[T]he grievant is not required by [§ 633(b)] to commence the state proceedings within time limits specified by state law."). Similarly, in *EEOC v. Commercial Office Products Co.*, 486 U.S. 107 (1988), the Supreme Court held that a Title VII plaintiff's failure to comply with a state statute of limitations in presenting her grievance to the state agency was irrelevant in determining whether she could proceed to federal court. *See id.* at 123 ("[S]tate time limits for filing discrimination claims do not determine the applicable federal time limit.").

For both of those frameworks, the Supreme Court relied on three primary arguments to conclude that failure to comply with state time limits could not prevent the plaintiff from coming to federal court. All three arguments are applicable in the present case. First, the Court found in both instances that the absence of any mention in the statutes' text of any requirement of timeliness under state law indicated Congress's intent that state time requirements could not bar the federal claims. In both cases, the Court insisted that such a requirement could be imposed only by explicit mention. *See Oscar Mayer*, 441 U.S. at 759 ("In particular, there is no requirement [in the ADEA] that, in order to commence state proceedings and thereby preserve federal rights, the grievant must file with the State within whatever time limits are specified by state law."); *Commercial Office Prods.*, 486 U.S. at 124 ("Title VII, like the ADEA, contains no express reference to timeliness under state law."). Second, the Court emphasized that state statutes of limitations should not serve as a bar to federal court "'in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.'" *Oscar Mayer*, 441 U.S. at 761 (quoting *Love v. Pullman Co.*,

404 U.S. 522, 527 (1972)); *accord Commercial Office Prods.*, 486 U.S. at 124. Third, the Court reasoned that state procedural rules should not be able to prevent a federal court from remedying a harm that Congress sought to prevent. The requirement that plaintiffs first initiate state proceedings gave states "a limited opportunity" to resolve discrimination complaints, and "[i]ndividuals should not be penalized if States decline, for whatever reason, to take advantage of these opportunities." *Oscar Mayer*, 441 U.S. at 761; *see also Commercial Office Prods.*, 486 U.S. at 123-24 (recognizing that the filing provisions of the ADEA and Title VII are nearly identical and that the same policy considerations apply in each).

The latter two arguments unquestionably apply with equal force in the context of the PLRA. First, the prison grievant is generally the epitome of the layperson, unassisted by a trained lawyer, seeking to invoke the legal process. Further, if states may not use administrative time limits to defeat an ADEA or a Title VII claim, they should not be able to defeat a claim under the Civil Rights Act of 1871, Congress's preeminent declaration that state officials may not undermine federal law. "A major factor motivating the expansion of federal jurisdiction through [the predecessor to 42 U.S.C. § 1983] was the belief of the 1871 Congress that the state authorities had been unable or unwilling to protect the constitutional rights of individuals or to punish those who violated these rights." *Patsy v. Bd. of Regents of Florida*, 457 U.S. 496, 505 (1982) (refusing, absent explicit congressional instruction, to create an exhaustion requirement for § 1983 suits). If we were to create a rule that permitted states to defeat § 1983 suits with their administrative time limits, however, and thereby let "unable or unwilling" state authorities prevail over "the constitutional rights of individuals," *id.*, we would have undone what Congress wrought. These rationales, which the Supreme Court relied on to hold that compliance with state statutes of limitations is irrelevant to a plaintiff's ability to

bring a federal claim, apply with equal or stronger force to claims under § 1983.[3]

Thus the only question is whether the language of § 1997e, which prevents prisoners from challenging prison conditions "until such administrative remedies as are available are exhausted," 42 U.S.C. § 1997e(a), distinguishes the PLRA

---

[3] Another, subsidiary argument relied on in the ADEA context supports our conclusion. The Supreme Court reasoned in *Oscar Mayer* that, because another provision of the ADEA identified a statute of limitations for claims brought under that Act, the Court could not "attribute to Congress an intent through [29 U.S.C. § 633(b)] to add to these explicit requirements by implication and to incorporate by reference into the ADEA the various state age-discrimination statutes of limitations." *Oscar Mayer*, 441 U.S. at 762-63. This structural argument applies with similar force in the § 1983 context. Because 42 U.S.C. § 1988(a) indicates that the statute of limitations for an action under § 1983 is to be that provided for by "the common law, as modified by the constitution and statutes of the State" of jurisdiction, 42 U.S.C. § 1988(a), which under Ohio law provides for two years, *see Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (en banc), for us to borrow a different, thirty-day statute of limitations suggested by an administrative agency for its own internal grievance process would attribute to Congress an intent that appears nowhere in the PLRA and is inconsistent with the reasoning of *Oscar Mayer*. Congress nowhere suggested an intention "to incorporate by reference," *Oscar Mayer*, 441 U.S. at 762-63, state administrative deadlines.

That Congress has instructed us to borrow a state's statute of limitations on personal injury actions in no way implies that we should borrow a state prison's administrative deadlines. The two deadlines serve very different purposes; whereas a state legislature's incentives in setting its personal injury statute of limitations will be well balanced, a state prison's incentives in setting a time limit on inmate grievances — especially if the limit would insulate prison officials from § 1983 suits — would likely lead to shorter and shorter limitations periods. *Compare, e.g.*, Kentucky Corrections Policy 14.6(VI)(J) (requiring aggrieved inmate to file grievance within five days, and appeal within *three* days), *with Collard v. Kentucky Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990) (recognizing statute of limitations for § 1983 actions at one year for those in Kentucky's general population). Although state officials may have legitimate reasons for imposing deadlines on inmate grievances, there is no reason that a prison's legitimate interest in, for example, conserving investigative resources must prohibit federal court jurisdiction.

from the ADEA and Title VII in such a way as to permit state agencies to defeat federal claims. Title VII's filing requirement, after which the ADEA's was patterned, reads as follows:

In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection [(b)] of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

42 U.S.C. § 2000e-5(c). To be sure, as the *Oscar Mayer* court indicated, a requirement that a would-be federal plaintiff exhaust state remedies is different from a requirement that the plaintiff commence state proceedings. *See Oscar Mayer*, 441 U.S. at 761. Accordingly, as Congress requires that an inmate exhaust available administrative remedies, 42 U.S.C. § 1997e(a), the question is what exhaustion requires.

In a number of cases, the Supreme Court has suggested that exhaustion is the antonym of commencement. Whereas commencement requires the plaintiff to begin, exhaustion

requires the plaintiff to finish. In *Oscar Mayer*, for example, the distinction between the ADEA's requirement and an exhaustion requirement focused not on any purported difference in the two requirements' power to defeat federal claims, but on the simple fact that 29 U.S.C. § 633(b) "requires only that the grievant *commence* state proceedings." *Oscar Mayer*, 441 U.S. at 759 (emphasis in original). Exhaustion, then, provides the flip side of that coin, "requir[ing] the court to delay action *until the administrative phase of the state proceedings is terminated.*" *Gibson v. Berryhill*, 411 U.S. 564, 574 (1973) (emphasis added). Unlike the commencement requirement, which is crafted to give state agencies an opportunity to resolve a problem while federal action proceeds on a parallel track, *see Oscar Mayer*, 441 U.S. at 757 (recognizing that ADEA set up "concurrent rather than sequential state and federal administrative jurisdiction"), exhaustion is a termination requirement, designed to keep federal courts out as long as the state administrative machinery is working to resolve the problem. Even the dissenters in *Patsy v. Board of Regents of Florida*, who argued that § 1983 included a judicially created exhaustion requirement for all plaintiffs, agreed that an exhaustion requirement "does not defeat federal-court jurisdiction, it merely defers it." *Patsy*, 457 U.S. at 532 (Powell, J., dissenting). Thus when Congress imposed an exhaustion requirement in the PLRA, but imposed no other restrictions, it imposed a termination requirement. *See, e.g.*, *United States v. Wells*, 519 U.S. 482, 495 (1997) ("[W]e presume that Congress expects its statutes to be read in conformity with this Court's precedents.").

With the PLRA, Congress could have required more than an exhaustion requirement, but it chose not to. Congress could have, for example, required in § 1997e(a) that, "In exhausting available administrative remedies, the prisoner shall comply with the prison's reasonable time limits for filing grievances. Untimely claims shall be deemed procedurally defaulted." Had Congress done so, the present case would be much easier. But Congress did not, and the

Supreme Court has instructed that we are not to impose such requirements when Congress refuses. *See Commercial Office Prods.*, 486 U.S. at 124 ("Title VII, like the ADEA, contains no express reference to timeliness under state law."); *Patsy*, 457 U.S. at 514 (reasoning that legislatures, not courts, are to determine "what consequences should attach to the failure to comply with procedural requirements of administrative proceedings"); *Oscar Mayer*, 441 U.S. at 759 ("In particular, there is no requirement that, in order to commence state proceedings and thereby preserve federal rights, the grievant must file with the State within whatever time limits are specified by state law.").

To reach the contrary conclusion, we would have to impose a judicially created procedural default rule, going well beyond the exhaustion rule that Congress imposed with the PLRA and contravening the Supreme Court's explicit instructions in the *Oscar Mayer* line of cases. This may be a tempting and common mistake, but it is a mistake nonetheless, as *Coleman v. Thompson*, 501 U.S. 722 (1991), shows. In discussing a habeas petitioner who filed an untimely notice of appeal in state court, the Court in *Coleman* reasons, "A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him." *Id.* at 732. That is, by filing the notice of appeal, even though untimely, the petitioner had exhausted his state remedies. The petitioner failed not because he had failed to exhaust his remedies, but because he had procedurally defaulted them. *See id.* ("*In the absence of the independent and adequate state ground doctrine* in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court.") (emphasis added). Procedural default is thus distinct from the exhaustion requirement, an additional requirement added on top of exhaustion.

Although there may be an "interplay" between the two doctrines, *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999),

and they appear together when there is a procedural default "at trial, on appeal, or on state collateral attack," *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000), the Supreme Court's habeas decisions make clear that they are different doctrines that impose different requirements. The judiciary created the procedural default rule to ensure that courts did not issue advisory opinions when an independent and adequate state ground supported a state court's judgment, and extended the rule into the habeas context only because "a state prisoner is in custody *pursuant* to a judgment" that would be rendered ineffective by a federal court's ruling. *Coleman*, 501 U.S. at 729-30 (emphasis in original). This extension of the procedural default rule into the habeas context obviously cannot support its extension into exhaustion of prison administrative remedies, as we have never considered a state warden's decision on a grievance to be the equal of a full state-court judgment. Indeed, the Supreme Court's habeas decisions instruct that, whereas the procedural default doctrine requires a habeas petitioner to comply with reasonable state procedural rules, the exhaustion requirement requires that "state prisoners . . . give the state courts one full opportunity to resolve any constitutional issues by invoking one compete round of the State's established appellate review process." *Boerckel*, 526 U.S. at 845. This is precisely our holding here.

Thus the only ground for barring a federal § 1983 suit due to an untimely prison grievance is that we would otherwise render prison grievance procedures irrelevant. If a prisoner knows that he or she may file a federal suit by filing an untimely grievance, the argument goes, prisoners will have an incentive to bypass the prison grievance process by waiting until its deadline has passed, filing an untimely grievance, and then proceeding to federal court. Indeed, the Seventh Circuit appears to have relied on this policy argument in holding that an untimely grievance will bar a § 1983 suit. *See Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir.), *cert. denied*, -- U.S. --, 123 S. Ct. 414 (2002). However, not only does this argument sweep aside the meaning of exhaustion, it is an

argument that the Supreme Court specifically rejected in *Oscar Mayer* itself. There is "[n]o reason" why one would "wish to forgo an available state remedy," the Court reasoned; "[p]rior resort to the state remedy would not impair the availability of the federal remedy, for the two are supplementary, not mutually exclusive." *Oscar Mayer*, 441 U.S. at 764. That is, permitting prisoners to file in federal court following an untimely grievance in no way creates an incentive to bypass state remedies, for potential litigants will still have every incentive to raise their grievance within the prison's timelines, because it is in the prison grievance process that inmates will, for most practical purposes, receive their swiftest and most effective remedies. Those who bypass it will generally do so to their own disadvantage. In fact, the policy argument works in favor of the conclusion we reach here: prison administrators, knowing that their refusal to entertain grievances filed after certain deadlines will not protect them from subsequent litigation, will more likely take advantage of the opportunity to resolve the grievance that the PLRA has granted them.[4]

---

[4]There is no doubt that deadlines are mutually beneficial for both prison administrators and prisoners. The dissenting opinion claims that we view "time limits as mere traps for the unwary, and utterly fail[] to acknowledge that procedural deadlines serve the legitimate interests of both sides to a dispute" and the dissent accuses us of ascribing "nefarious motives . . . to prison administrators who seek to enforce . . . deadlines." Diss. Op. at 30 (emphasis deleted). Then, while mistakenly criticizing the majority for an assumption it does not make, the dissenting opinion makes the equally sweeping and erroneous presumption that absent a procedural default requirement, prisoners will have "*carte blanche* . . . to ignore any and all administrative time limits" and will purposefully default their administrative remedies to seek a trip to federal court. *Id.* at 32.

However, the perception that the absence of procedural default guidelines in this area will result in prisoners purposefully not filing grievances within the deadlines in order to bypass the internal prison system is counterbalanced by the equally real concern that in the presence of procedural default standards, prison administrators will impose shorter and shorter deadlines measured in hours and days, because prisoners will then have no recourse to the federal courts if they miss even one deadline. Following the dictates of Congress and refraining from judicially

Thus the PLRA's exhaustion requirement distinguishes the PLRA from the interpretations of Title VII and the ADEA, but not in a manner meaningful for this case. Exhaustion of state administrative remedies under the PLRA requires a plaintiff not only to bring his or her claim before the state, but to see it through to completion, appealing denials as permitted and participating in offered hearings. Exhaustion also requires a plaintiff to bring a grievance to the state before coming to federal court even when the state has made clear that it will not grant the relief requested. *See Booth*, 532 U.S. at 736. But just as a state prison system's decision not to grant certain kinds of relief does not strip the federal courts of their power to grant that relief under § 1983, so too its decision not to grant relief in particular cases — whether for timeliness or for any other state procedural requirement — does not strip the federal courts of their power to do so. Thomas brought his grievance to the prison officials' attention, they refused to hear it, and he appealed their decision through each available level. That prison officials did not wish to address his complaint, as they prefer only to address complaints brought before them within thirty days, is irrelevant for our purposes. Thomas gave the state officers an opportunity, which is all that is required. We may not penalize Thomas simply because the prison does not wish to

---

imposing a procedural default mechanism where none was legislated best balances these concerns and maintains the mutually advantageous internal grievance system.

Both prisoners and prison administrators gain little from prisoners jumping right to federal court as opposed to utilizing the prison grievance system first, because internal resolution of disputes gives prisoners more of an opportunity for quick resolution of their problems. Judicial restraint, exercised by the majority by not grafting a procedural default requirement onto the PLRA, serves both prisoners and prisons here because it maintains the potential for federal recourse. As a result, prison officials will not make grievance deadlines unduly short, as they will establish timelines that are lengthy enough to permit administrators to evaluate grievances internally so as to avoid a trip to the federal courthouse. Prisoners in turn will have more time to meet deadlines and prepare their grievances.

hear grievances more than thirty days after the incident. *See Oscar Mayer*, 441 U.S. at 761. We therefore hold that a prisoner who has presented his or her grievance through one complete round of the prison grievance process has exhausted the available administrative remedies under 42 U.S.C. § 1997e(a), regardless of whether the prisoner complied with the grievance system's procedural requirements.

### III.  EXHAUSTION OF CLAIMS

Although a grievance that is untimely under prison rules still gives state prison officials an opportunity to address an inmate's complaints, a grievance that does not give officials notice of the nature of the inmate's grievance does not afford the officials the opportunity the PLRA requires. Thomas argues that between his official grievance form and his cooperation with the prison's Use of Force investigation, in which he specifically mentioned the presence of other officers who failed to protect him, he gave prison officials sufficient notice for them to address his concerns in the grievance process. True though that may be, our cases require more. Because Thomas made no reference to the issues involved in his failure-to-protect claim in his grievance, we must find that he failed to exhaust his administrative remedies with respect to the claims against Kepler, Starcher, and Waddell.

Thomas's grievance form does not offer the kind of information that our precedent requires for exhausting his claims against Kepler, Starcher, and Waddell. Thomas's grievance mentions neither the defendants themselves nor any facts suggesting that officers other than Woolum knew anything of the incident. Thomas was indisputably aware of the other officers' presence at the time, as he mentioned them in the incident report he filed the day after the beating, so this case falls under the rule of *Curry v. Scott*, 249 F.3d 493 (6th Cir. 2001), which requires that "a prisoner file a grievance against the person he ultimately seeks to sue," *id.* at 505. Similarly, in *Hartsfield v. Vidor*, we ruled that a prisoner who named three officers in his grievance, and who could have but

did not name two additional officers, had not exhausted his administrative remedies with respect to the two previously unnamed officers. *Hartsfield*, 199 F.3d at 308-09. He thus did not "administratively exhaust his . . . claim as to each defendant associated with the claim." *Burton v. Jones*, 321 F.3d 569, 574 (6th Cir. 2003). Although an inmate need not identify each officer by name when the identities of the particular officers are unknown, Thomas here knew one onlooking officer's identity and knew that others had watched the beating as well. Accordingly, his grievance form should have noted either the other officers' names or the fact that other officers had seen the beating.

Thomas suggests that his deficient grievance notwithstanding, he satisfied the exhaustion requirement by participating fully in the prison's internal investigation. Indeed, the day after the attack, Thomas told prison officials that Officer Waddell and other officers had witnessed Officer Woolum's actions, a notification that — when combined with Thomas's subsequent filing of an official grievance regarding the incident — would seem to accomplish many purposes of the PLRA's exhaustion requirement. However, it is no longer sufficient for an inmate simply to give prison officials notice of the complaint by cooperating with other investigations, as was sufficient in such pre-PLRA "substantial compliance" cases as *Wolff v. Moore*, 199 F.3d 324, 329 (6th Cir. 1999). In our post-PLRA cases we have emphasized that "the exhaustion requirement in § 1997e(a) is directed at exhausting the *prisoner's* administrative remedies," and that Use of Force or other investigations do not satisfy the PLRA's dictates. *Freeman*, 196 F.3d at 644. In determining whether the inmate has exhausted his or her remedies, we thus look to the inmate's grievance, not to other information compiled in other investigations. Although an inmate grievance might conceivably specifically incorporate or otherwise refer to information previously obtained, it must do so in a manner that points prison officials to the relevant materials. That is not what happened here.

Finally, Thomas suggests that our requirement that prison grievances be filed "against" potential defendants, *Curry*, 249 F.3d at 505, mistakes the prison grievance process as a type of civil action. Grievances are not filed "against" individual persons, Thomas argues, but are rather filed regarding certain problems; accordingly, a grievance should be understood to exhaust remedies so long as it alerts prison officials to a problem to be investigated, whether or not it identifies specific individuals. *Sims v. Apfel*, 530 U.S. 103 (2000), supports Thomas's position. In *Sims*, a Social Security case, the Supreme Court ruled that even when a party is required to exhaust administrative remedies, the plaintiff is not necessarily required to exhaust each specific issue that he or she intends to bring to federal court. *See id.* at 112 (plurality); *id.* at 113 (O'Connor, J., concurring). Rather, "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Id.* at 109 (majority). Applying the reasoning of *Sims* to the problem-solving mechanism of an inmate grievance procedure, a court might well conclude that the process is "inquisitorial rather than adversarial," *id.* at 111 (plurality), and thus that a court should not impose an issue-exhaustion requirement on top of the PLRA's general exhaustion requirement. On that view, an inmate's grievance informing prison officials that he had been beaten by an officer would be sufficient to notify the prison of claims arising out of that beating, including, perhaps, a claim that other officers had witnessed the event but failed to intervene. However, we are bound by our decision in *Curry*, which apparently found the *Sims* reasoning inapplicable in the prison context and which thus requires prisoners to file grievances "against" specific defendants. *See Hinchman v. Moore*, 312 F.3d 198, 203 (6th Cir. 2002) (noting that one panel cannot overrule a prior panel's published decision). Thomas is thus subject to *Curry*'s standards; as his grievance contained no information relevant to his claims against Kepler, Starcher, and Waddell, we conclude that he has not exhausted his claims with respect to those defendants.

## IV. CONCLUSION

Had Thomas's grievance pointed prison officials to the alleged presence of other officers when Officer Woolum was beating him, it would have given the officials a sufficient opportunity to investigate the other officers' actions. The prison may have declined that opportunity, as it prefers to address only those grievances filed within a particular time limit. But the prison would have been given the opportunity, which is all that § 1997e(a) requires, so we hold that the timeliness of an inmate's grievance is irrelevant under the PLRA's exhaustion requirement. Because Thomas's grievance did not contain the necessary information, however, it did not give prison officials the requisite opportunity. We thus conclude that Thomas failed to exhaust his administrative remedies with respect to Officers Kepler, Starcher, and Waddell, and we **AFFIRM** the district court's judgment.

---

## CONCURRENCE

---

RONALD LEE GILMAN, Circuit Judge, concurring. I fully concur in Judge Moore's opinion. My purpose in writing separately is to acknowledge the difficulty of the issue before us and to explain why I believe that Judge Rosen's opinion is less persuasive in interpreting what it means to exhaust "available administrative remedies" under the PLRA.

To begin with, I must confess that I find the question of whether a prisoner must comply with the prison's administrative deadlines as a precondition to filing a § 1983 action in federal court to be extremely difficult. I have indeed flip-flopped on this issue during the course of extensive deliberations with my two erudite colleagues, no doubt to the frustration of them both. The assertiveness of Judge Rosen's opinion is more than sufficient to give anyone pause, especially his accusations that we have issued an "invitation to chaos and delay" (Dissenting Op. at 30), "abandon[ed] all notions of judicial restraint" (*id.* at 31), provided "a classic example of judicial meddling" (*id.* at 31), and engaged in "thinly-veiled policymaking" (*id.* at 32). In the end, however, I find that these sweeping generalizations generate more heat than light, and that his position is actually the more "activist" in an expansive interpretation of the PLRA beyond Congress's language and the Supreme Court's precedents.

The heart of the problem is that the failure to apply the concept of procedural default to a prison's administrative deadlines will, in cases such as the one before us, obligate the federal courts to deal with the § 1983 issues without the benefit of the state's administrative consideration on the merits. This makes the issue difficult for me because, were I a legislator, I would think it sound policy to require prisoners to comply with reasonable administrative deadlines. On the other hand, as pointed out by Judge Moore, this legitimate

concern "is counterbalanced by the equally real concern that in the presence of procedural default standards, prison administrators will impose shorter and shorter deadlines measured in hours and days, because prisoners will then have no recourse to the federal courts if they miss even one deadline." (Maj. Op. at 19 n.4) These competing policy considerations, however, are better reserved for Congress to resolve than for us to adjudicate.

In deciding this issue, the two factors that ultimately persuade me are that (1) Congress could have, but did not, specify that a prisoner's failure to comply with the prison's reasonable time limitations would result in a procedural default (*see* Maj. Op. at 16-17), and (2) Supreme Court precedents continue to distinguish between the concepts of exhaustion of remedies and procedural default. Congress, if it desires a different outcome, is clearly able to make an appropriate amendment to the PLRA. Judge Rosen or I might have drafted the current statute differently, but we are not legislators. As a judge on the court of appeals, I do not feel that I should attempt to alter the PLRA as it presently stands.

Judge Rosen obviously subscribes to a different analysis. In his opinion, the concept of procedural default is built into the concept of exhaustion of remedies. But the Supreme Court cases that he relies on—*Boerckel*, *Carpenter*, and *Coleman*—do not, in my opinion, support his analysis.

Judge Rosen, for example, quotes the Supreme Court's statement in *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999), that "we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies." *Id.* at 848 (emphasis in original). If procedural default were a necessary component of exhaustion in the habeas corpus context (rather than an independent, complementary doctrine), this sentence would make no sense. The Supreme Court would instead have simply stated: "We ask whether a prisoner has exhausted his state remedies." What the Supreme Court actually said, however, is that "we

ask *not only* whether a prisoner has exhausted his state remedies, *but also* whether he has *properly* exhausted those remedies." *Id.* (first two emphases added; third emphasis in original). Basic English grammar, not "adroit deconstruction" (Dissenting Op. at 47), therefore compels the conclusion that, under the Supreme Court's precedents, exhaustion and procedural default are two distinct concepts. *Carpenter* and *Coleman* make the same differentiation. *Carpenter*, 529 U.S. 446, 453 (2000); *Coleman*, 501 U.S. 722, 732 (1991).

In the final analysis, my policymaker heart yearns for the result proposed by Judge Rosen, but my judicial head tells me that Judge Moore has reached the correct result. Our legal system requires us to heed the words of Congress as interpreted by applicable Supreme Court precedent. Until Congress changes the law or the Supreme Court corrects our interpretation of its language, I am unwilling to read the concept of procedural default into the PLRA.

## CONCURRING IN PART, DISSENTING IN PART

ROSEN, District Judge, dissenting in part and concurring in the judgment.

With one bold stroke, the lead opinion stands much of this Circuit's existing precedent on administrative exhaustion on its head, holding that administratively established filing deadlines mean nothing in a prisoner's effort to exhaust his remedies before commencing a § 1983 suit. By permitting inmates to thumb their noses at such time limits, the lead opinion thoroughly disables prison grievance systems as meaningful tools for dispute resolution — a result deemed unacceptable by every other Circuit that has addressed the timeliness issue to date. More importantly, this result is wholly at odds with Congress's intent in enacting the Prison Litigation Reform Act ("PLRA") and amending 42 U.S.C. § 1997e(a) to establish a strict, mandatory exhaustion requirement for prisoner § 1983 suits.

Still worse, however, is that this departure from precedent and congressional intent is utterly unnecessary to our ultimate judgment in this case. The District Court plainly must be affirmed here, on the obvious ground that Plaintiff/Appellant Douglas Thomas failed to exhaust his remedies against those Defendants/Appellees who were not even mentioned in his prison grievance. The lead opinion ultimately reaches precisely this conclusion, and I fully concur on this point. But first, the lead opinion goes out of its way to rewrite the law on a different issue, notwithstanding its lack of bearing upon the outcome of this case. Rather, the mischief is wholly prospective — and, I might note, crafted in such a way as to seemingly insulate it from further review.

The issue upon which I part company with my colleagues is easily stated — whether an inmate presumptively must

comply with the procedural aspects of a prison's grievance system, including its time limits, in order to satisfy the mandatory exhaustion requirement of § 1997e(a). This issue already has been settled in this Circuit. We have held, for example, that an inmate does not exhaust his administrative remedies unless and until he pursues all avenues of appeal that are available within the prison grievance system. *See, e.g., Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999); *White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997); *Wright v. Morris*, 111 F.3d 414, 417 n.3 (6th Cir.), *cert. denied*, 522 U.S. 906 (1997). Such a failure to appeal is a species of procedural default, *see O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S. Ct. 1728, 1734 (1999), legally indistinguishable from the sort of procedural default at issue in this case — namely, a prisoner's failure to meet an administrative filing deadline.

Yet, the lead opinion explains that this case is different, because it involves a late filing at the threshold of the administrative process, rather than a failure to proceed to the next level of this process. And, indeed, this is a distinction — an inmate who fails to pursue an administrative appeal has exhausted at least *some* available remedies, while a prisoner whose grievance is properly rejected as untimely (as happened here) has exhausted *none.* Nevertheless, in the Alice-in-Wonderland world conjured up in the lead opinion, the latter course now is favored over the former in this Circuit.

Or is it? In cases which formerly were controlled by our procedural default decisions, the lead opinion now provides an open-ended opportunity for inmates to cure any sort of procedural defect that a court might identify. After all, dismissal in such cases is without prejudice, *see Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir.), *cert. denied*, 525 U.S. 833 (1998), and, after today, inmates are no longer bound by administrative deadlines of any sort. Consequently, if a prisoner's case is dismissed for failure to proceed through all steps of the administrative process, the inmate now can

respond by completing the process, even though the relevant deadlines might long since have passed. In short, much of our existing precedent on prisoner exhaustion has been rendered meaningless, and the courts in this Circuit have been relegated to the role of providing legal advice to prisoners on the proper filing of grievances.

Indeed, this invitation to chaos and delay must, of necessity, be a two-way street. If prisoners no longer are bound by deadlines, the same surely must be true for prison administrators. Although prison regulations often call for decisions to be reached within a specified time frame, administrators presumably may now withhold their rulings indefinitely, and then argue that any § 1983 suit is premature until a decision eventually is forthcoming. In the event that a court might conclude differently, prison administrators could simply rewrite their regulations to remove any time limits upon their decisionmaking process. We could hardly complain, given the lack of significance that the lead opinion places upon administrative deadlines, and given the nefarious motives it ascribes to prison administrators who seek to enforce such deadlines.

Here lies the root of my disagreement with the lead opinion — it seemingly views time limits as mere traps for the unwary, and utterly fails to acknowledge that procedural deadlines serve the legitimate interests of *both sides* to a dispute. This undoubtedly is why such limits are a standard feature of virtually every dispute resolution process of which I am aware. As a *quid pro quo* for their strict and uniform adherence to these deadlines, parties are assured that their dispute will be promptly resolved, and that justice will not be effectively denied through interminable delay. This interest is particularly compelling here, where the core purpose of § 1997e(a)'s exhaustion requirement is to ensure that prisoner grievances are resolved administratively to the greatest extent possible. *See Porter v. Nussle*, 534 U.S. 516, 525, 122 S. Ct. 983, 988 (2002). While I do not question the sincerity of the lead opinion's view that this purpose is served by

disregarding filing deadlines, I believe that this judgment rests upon a fundamental misapprehension of the importance of time limits to the effective and orderly functioning of any dispute resolution system.

As a result, today's decision is a classic example of judicial meddling, with this panel substituting its own policy judgment in place of the far different one made by Congress in enacting § 1997e(a) in its present form. The statute requires that prisoners must exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a). As even the lead opinion concedes, the prisoner in this case, Douglas Thomas, exhausted these remedies only in the most technical sense — once his grievance was rejected as having been filed nearly five months past the relevant deadline, he had exhausted all of the remedies that were then "available" to him. Yet, we have sensibly recognized — and all other Circuits that have considered the matter have agreed — that "it would be contrary to Congress's intent" to permit a prisoner to procedurally default his grievance and then claim that administrative remedies no longer are "available." *Wright*, 111 F.3d at 417 n.3; *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1023-24 (7th Cir.), *cert. denied*, 123 S. Ct. 414 (2002); *Harper v. Jenkin*, 179 F.3d 1311, 1312 (11th Cir. 1999); *Marsh v. Jones*, 53 F.3d 707, 710 (5th Cir. 1995). This plain, pragmatic reading of § 1997e(a) is wholly at odds with the lead opinion's effort to distinguish between an inmate's "mere" procedural default and a failure to exhaust his remedies.

To what end does the lead opinion abandon all notions of judicial restraint and overturn this settled understanding of administrative exhaustion? Presumably, the lead opinion means to ensure that future prisoner § 1983 suits do not fall victim to the cunning device of administrative filing deadlines. Never mind that there is no record before us of any large-scale, or even occasional, difficulty in complying with such deadlines — fully seven years after Congress amended § 1997e(a) in 1996, we publish a decision on this issue for the

first time today. Never mind that there is nothing inherently unreasonable or suspicious about the 30-day filing limit imposed by Ohio prison officials in this case. Never mind that prisoner Thomas has not identified any obstacles he confronted in meeting this deadline. Never mind that, even if he had, we could readily address this concern through case-specific equitable tolling of the filing period, as opposed to the lead opinion's *carte blanche* for any and all inmates to ignore any and all administrative time limits.

In my view, it is precisely this sort of thinly-veiled policymaking that leads Congress to ever more curtail our judicial discretion. Indeed, Congress did just that in amending § 1997e(a) through the PLRA, enacting a mandatory provision which eliminated the courts' prior "discretion to dispense with administrative exhaustion" and imposed "an obviously broader exhaustion requirement." *Booth v. Churner*, 532 U.S. 731, 739, 741, 121 S. Ct. 1819, 1824, 1825 (2001). Upon reviewing this legislation, the Supreme Court concluded that Congress "may well have thought we were shortsighted" in prior decisions which tended to downplay the value of administrative exhaustion. *Booth*, 532 U.S. at 737, 121 S. Ct. at 1823. If so, Congress surely will be chagrined by today's result, which opens the courts to even more claims that have never been addressed on the merits in a prison's administrative grievance system.[1] Accordingly, I dissent from the Court's ruling on the timeliness issue, and concur only in its judgment affirming the District Court.

---

[1] I doubt that Congress (or prison officials) will be much consoled by the lead opinion's assurance that it has exercised "[j]udicial restraint." (Lead Op. at 19-20 n.4.) To say it does not make it so.

## I.

I begin with what seems to me an obvious point — that the decision upon which the lead opinion principally relies, the decades-old *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 99 S. Ct. 2066 (1979), is not the first place one would look for guidance in construing the exhaustion requirement of § 1997e(a). Among myriad other grounds for distinction, to which I will return later, *Oscar Mayer* deals with a requirement of commencement rather than exhaustion, and addresses a detailed statutory scheme with a number of unique features — *e.g.,* concurrent state and federal administrative jurisdiction, an express federal statute of limitations, and an explicit definition of what constitutes "commencement" of state proceedings — that have no counterpart in the statute at issue here. Thus, I find it more useful to start with the language of § 1997e(a) itself, our own direct pronouncements on the meaning of this provision, and the views of other Circuits on this subject. In the event that this survey does not settle the issue, I find it instructive to review the Supreme Court's treatment of a similar statutory exhaustion requirement imposed upon state prisoners — namely, the requirement that they "exhaust[] the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A), before seeking habeas corpus relief in federal court. All of these sources, in my view, point unmistakably toward the conclusion that exhaustion under § 1997e(a) entails compliance with a prison's administrative procedures, including filing deadlines.

Any analysis of § 1997e(a) necessarily must begin with the language of the statute itself. As noted, prior to its 1996 amendment through the PLRA, the statute's call for exhaustion was largely discretionary — courts were authorized to stay an inmate's § 1983 suit for up to 180 days while the prisoner exhausted such available administrative remedies as were "plain, speedy, and effective," but only if the court deemed this "appropriate and in the interests of justice." 42 U.S.C. § 1997e(a)(1) (1994 ed.). The current

provision, in contrast, entirely eliminates this judicial discretion, and instead mandates strict exhaustion in every case:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Through this enactment, Congress "invigorated the exhaustion prescription," thereby seeking "to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524, 122 S. Ct. at 988. While the pre-PLRA version of § 1997e invited judges to assess the efficacy of a prison's dispute resolution processes, the current statute decidedly does not "prescribe[] appropriate grievance procedures or enable[] judges, by creative interpretation of the exhaustion doctrine, to prescribe or oversee prison grievance systems." *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).

Given the clear command of § 1997e(a) in its present form, the lead opinion properly observes that "the question is what exhaustion requires." (Lead Op. at 15.) Whatever the precise contours of this requirement, it plainly is procedural in nature:

> While the modifier "available" requires the possibility of some relief for the action complained of . . . , the word "exhausted" has a decidedly procedural emphasis. It makes sense only in referring to the procedural means, not the particular relief ordered. It would, for example, be very strange usage to say that a prisoner must "exhaust" an administrative order reassigning an abusive guard before a prisoner could go to court and ask for something else; or to say (in States that award money damages administratively) that a prisoner must "exhaust" his damages award before going to court for more. How would he "exhaust" a transfer of personnel? Would he

have to spend the money to "exhaust" the monetary relief given him? It makes no sense to demand that someone exhaust "such administrative [redress]" as is available; one "exhausts" processes, not forms of relief, and the statute provides that one must.

*Booth*, 532 U.S. at 738-39, 121 S. Ct. at 1824.

This Circuit's precedents reflect a similar understanding of the nature of § 1997e exhaustion. As noted at the outset, we have held on several occasions that a prisoner must fully pursue all administrative processes to completion, including all available avenues of internal appeal, in order to satisfy § 1997e(a) and commence a § 1983 suit. *See, e.g., Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999); *Freeman*, 196 F.3d at 645; *White*, 131 F.3d at 595. In so ruling, we have consistently taken note of the filing deadlines that govern these administrative processes, and have cautioned inmates to pay heed to these time limits.

In *Hartsfield*, for example, the plaintiff prisoner, Napoleon Hartsfield, complained that he had been unlawfully placed in top-of-bed restraints for eighteen hours. Hartsfield contended that he had submitted an administrative grievance a day after the incident, but he produced no evidence of this filing. Instead, the record disclosed that Hartsfield had written to the grievance coordinator about two weeks later, stating that he had not been provided with a receipt for or response to his grievance. The grievance coordinator responded the next day that no grievance had been received, and that Hartsfield would have to refile. He chose instead to bring a § 1983 suit, and to pursue an administrative appeal only after a Magistrate Judge had instructed the parties to brief the issue of exhaustion. A prison official refused to allow this appeal, absent proof that Hartsfield had ever filed an initial administrative grievance.

Under this record, Hartsfield argued that his attempts at administrative exhaustion should be deemed to satisfy the

standards of § 1997e(a) or, alternatively, that any further efforts at exhaustion should be excused as futile. This Court disagreed:

Even if plaintiff did file an initial grievance . . . , he was required to continue to the next step in the grievance process **within the time frame set forth in the regulations** if no response is received from prison officials or if the prisoner is not satisfied with the response. We have previously held that an inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies *or that it is futile for him to do so because his grievance is now time-barred under the regulations*. *Wright v. Morris*, 111 F.3d 414, 417 n.3 (6th Cir.), *cert. denied*, 522 U.S. 906, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997). Plaintiff should have either refiled his grievance when he was informed . . . that the prison had no record of the grievance or provided [a] receipt[] . . . so he could have proceeded with an [administrative] appeal. We find, therefore, that plaintiff did not exhaust his administrative remedies . . . .

*Hartsfield*, 199 F.3d at 309 (emphasis added); *see also Freeman*, 196 F.3d at 645 (recognizing that the plaintiff prisoner "made some attempts to go through the prison's grievance procedures," but ordering dismissal because the plaintiff "filed his federal complaint before allowing the administrative process to be completed").

As noted in *Hartsfield*, we first endorsed this rule of complete exhaustion in *Wright*, 111 F.3d at 417 n.3. One of the plaintiff prisoners in *Wright* had filed an administrative grievance, but had not appealed the denial of this grievance through the entire administrative process. The inmate contended that he had exhausted all "available" remedies within the meaning of § 1997e(a), because the deadline for any further appeals had long since expired. We found it unnecessary to address this argument, in light of our

conclusion that the amended § 1997e(a) did not apply to the prisoner's pre-PLRA suit. Nonetheless, we emphasized:

> It is clear, however, that in the usual case in the future, where the alleged violations occurred after the PLRA's enactment, and inmates have both notice that exhaustion is required and a reasonable opportunity to file complaints, ***it would be contrary to Congress's intent in enacting the PLRA to allow inmates to bypass the exhaustion requirement by declining to file administrative complaints and then claiming that administrative remedies are time-barred and thus not then available***.

*Wright*, 111 F.3d at 417 n.3 (emphasis added); *see also Hrynczyn v. Mitchell*, No. 00-4320, 2001 WL 1299027, at *1 (6th Cir. Aug. 9, 2001) (rejecting a prisoner's argument that no administrative remedies were available because any grievance he filed would be dismissed as untimely).

Indeed, this Court has insisted that inmates be resourceful in their efforts to comply with prison grievance procedures. In *Jones v. Smith*, 266 F.3d 399, 400 (6th Cir. 2001), for instance, the plaintiff prisoner claimed that he had asked for a grievance form, but was told by a prison counselor to "get out of his office." We affirmed the dismissal of the case for failure to exhaust administrative remedies, reasoning that the plaintiff did "not allege that there was no other source for obtaining a grievance form or that he made any other attempt to obtain a form or to file a grievance without a form." *Jones*, 266 F.3d at 400. More generally, we have placed the burden upon prisoners to "allege and show that they have exhausted all available state administrative remedies," and have instructed that "[d]istrict courts should enforce the exhaustion requirement *sua sponte* if not raised by the defendant." *Brown, supra*, 139 F.3d at 1104.

Under these precedents, then, once a prison's filing deadline has passed, an inmate cannot simply dispense with

the filing of an administrative grievance on the ground that prison officials surely would reject it. In the present case, for example, if prisoner Thomas had altogether failed to file a grievance, rather than submitting it nearly five months after the prison's 30-day deadline, we would have been bound to conclude that this course of action did not comply with the dictates of § 1997e(a). This leads to the question whether an untimely filing should be accorded different treatment under § 1997e(a) than no filing at all.

As a matter of brute fact, Thomas's untimely filing in this case produced absolutely no benefit over an outright failure to file. His grievance was rejected as submitted outside the prison's 30-day limit, and there was no administrative review of his complaints on the merits. As a result, none of the aims of § 1997e(a) has been achieved here — Thomas's grievance did not spur corrective action that might have obviated the need for litigation, there has been no filtering of any frivolous claims, and no administrative record was developed that might assist the courts in understanding "the contours of the controversy." *Porter*, 534 U.S. at 525, 122 S. Ct. at 988. Nonetheless, the lead opinion holds that "Thomas gave the state officers an opportunity" to address his grievance, "which is all that is required" to satisfy the statutory exhaustion requirement. (Lead Op. at 20.)

This "opportunity-based" theory of exhaustion, however, improperly shifts the burden from inmates to prison officials, requiring that the latter seize upon any chance to address any complaint that a prisoner might raise at any time and through any means. As such, the lead opinion's reasoning runs counter to our precedents, which have consistently construed § 1997e(a) as demanding that ***inmates*** must invoke and fully exhaust a prison's administrative grievance processes. In *Freeman*, for example, the plaintiff prisoner alleged that he was assaulted by a corrections officer, and he argued that "an investigation by the prison Use of Force Committee and the Ohio State Highway Patrol into the alleged assault satisfies § 1997e(a) because the statute does not specify that

exhaustion must be through the prison's grievance procedure." 196 F.3d at 644. This Court disagreed, noting that use-of-force investigations can be initiated for a variety of reasons, and stressing "the importance of using the prison grievance process in order to alert prison officials to problems." *Freeman*, 196 F.3d at 644. More importantly, we held that "the exhaustion requirement in § 1997e(a) is directed at exhausting the *prisoner's* administrative remedies in the corrections system, and investigation by another agency does not satisfy the requirement of the statute." 196 F.3d at 644. We recently affirmed this rule, stating that "an investigation by a prison Use of Force Committee will not substitute for exhaustion through the prison's administrative grievance procedure." *Curry v. Scott*, 249 F.3d 493, 504 (6th Cir. 2001).

The present case perfectly illustrates the important distinction between internal use-of-force investigations and prisoner grievances. The Ohio prison officials themselves initiated an investigation of Thomas's beating, and a use-of-force committee concluded that Defendant Shawn Woolum had acted contrary to prison regulations in his assault on Thomas. Following this investigation, the prison authorities addressed the problem as they perceived it by discharging Woolum. If Thomas desired a broader inquiry or additional relief, whether from Woolum or others, it behooved him to file an administrative grievance bringing these matters to the attention of prison officials. Yet, under the lead opinion's broadest statement of its holding, Thomas need not have filed a grievance at all, so long as prison officials had the "opportunity" to discern what his complaints might be and address them. Such a rule is simply irreconcilable with this Court's prior decisions, which require a good deal more from the inmate himself before he may commence a § 1983 suit.

Perhaps, however, the lead opinion means to endorse a more limited rule, under which a prison official's "opportunity" to address an inmate's complaint must be triggered by the inmate's filing of a grievance, whether or not

untimely or procedurally deficient in some other way. Even this more limited proposition is at odds, in my view, with our oft-stated rule of complete exhaustion — though a timely-filed grievance plainly provides an "opportunity" (and, indeed, a duty) to address a prisoner's complaints, we still insist that the inmate pursue the matter through all available levels of the administrative process. More specifically, the lead opinion's disregard for administrative time limits goes against the considered views of two panels in this Circuit, albeit in unpublished decisions, and places us alone among the several Courts of Appeals that have addressed this precise issue.

This Court first considered this question in *Qawi v. Stegall*, No. 98-1402, 211 F.3d 1270, 2000 WL 571919 (6th Cir. May 3, 2000). In that case, the plaintiff prisoner's administrative grievance was rejected as untimely, but he argued that this delay should be excused as a result of his good faith efforts to resolve the matter informally. We held that the plaintiff had failed to exhaust his administrative remedies, observing that his grievance was untimely even under the prison rules governing informal dispute resolution. Similarly, in *Jacobs v. Wilkinson*, No. 00-3212, 2001 WL 1298979 (6th Cir. Aug. 8, 2001), the plaintiff inmate complained of two incidents — his grievance as to the first had been dismissed as untimely, and he had submitted only an informal complaint as to the second. We found that the plaintiff had failed to exhaust his administrative remedies as to either of his two complaints, making no distinction between his untimely grievance and his outright failure to file a grievance.

As noted, three of our sister Circuits have reached the same conclusion. First, in *Marsh*, *supra*, the Fifth Circuit upheld the dismissal of a prisoner's § 1983 suit for failure to exhaust administrative remedies under the pre-PLRA version of § 1997e(a), where the inmate's administrative grievance had been dismissed as untimely filed more than 30 days after the incident of which she complained. Although the version of

§ 1997e(a) then in effect authorized the courts to grant a continuance so that the plaintiff prisoner could exhaust any available administrative remedies, the Court reasoned that a continuance was not warranted under the circumstances of that case:

> Because the prison had already rejected [the plaintiff's] administrative grievance as untimely, her administrative remedies were foreclosed, and a continuance would have served no purpose.  When a section 1997e continuance would serve no purpose, a district court still has the power to dismiss a prisoner's suit under section 1997e for failure to exhaust administrative remedies . . . .  Without the prospect of a dismissal with prejudice, a prisoner could evade the exhaustion requirement by filing no administrative grievance or by intentionally filing an untimely one, thereby foreclosing administrative remedies and gaining access to a federal forum without exhausting administrative remedies.  Thus, we hold that a district court has the power to dismiss a prisoner's section 1983 suit under section 1997e even when administrative relief is time-barred or otherwise precluded.

*Marsh*, 53 F.3d at 710 (citations and footnote omitted).[2]

---

[2]Although *Marsh* predates § 1997e(a) in its present form, the Fifth Circuit recently confirmed the continued vitality of this decision in *Days v. Johnson*, 322 F.3d 863 (5th Cir. 2003).  The plaintiff inmate in *Days* alleged that a broken hand had prevented him from timely filing his administrative grievance, but that he had filed a grievance as soon as this injury had healed.  The Court found that these allegations, if proven, would suffice to show that the prisoner had "exhausted the administrative remedies that were personally available to him."  322 F.3d at 867.  The Fifth Circuit then emphasized the narrow reach of this ruling:

> We, of course, do not hold that an untimely grievance in and of itself would render the system unavailable, thus excusing the exhaustion requirement.  Such a holding would allow inmates to file suit in federal court despite intentionally evading the

The Eleventh Circuit also has held that an untimely grievance generally does not satisfy § 1997e(a)'s exhaustion requirement.  In *Harper*, *supra*, the plaintiff inmate's grievance was denied as untimely, and the inmate failed to invoke a prison procedure that authorized waiver of the filing deadline for "good cause" shown.  Under these circumstances, the Court held that the plaintiff "cannot be considered to have exhausted his administrative remedies."  *Harper*, 179 F.3d at 1312.  The Court reasoned that a contrary conclusion would permit inmates to "ignore the PLRA's exhaustion requirement and still gain access to federal court merely by filing an untimely grievance."  179 F.3d at 1312.

Most recently, the Seventh Circuit has joined in this consensus, construing § 1997e(a) as requiring that a prisoner "complete[] the administrative process by following the rules the state has established for that process," including filing deadlines.  *Pozo*, *supra*, 286 F.3d at 1023.  In *Pozo*, the plaintiff prisoner timely filed his initial grievance, but then waited a year before pursuing an administrative appeal.  He argued that Wisconsin prison officials had the discretion to waive the state's usual 10-day filing deadline, and that this power to hear an untimely appeal satisfied the purposes of the exhaustion requirement because it afforded the opportunity to address his complaints.  The Court disagreed:

---

PLRA's exhaustion requirement by failing to comply with the prison grievance system.  *See Harper v. Jenkin,* 179 F.3d 1311, 1312 (11th Cir. 1999); *see also Marsh v. Jones,* 53 F.3d 707, 710 (5th Cir. 1995) (previous version of § 1997e).  We emphasize that our holding is limited to the narrow facts of this case.  More specifically, administrative remedies are deemed unavailable when (1) an inmate's untimely filing of a grievance is because of a physical injury and (2) the grievance system rejects the inmate's subsequent attempt to exhaust his remedies based on the untimely filing of the grievance.

*Days*, 322 F.3d at 867-68 (footnote omitted).

[T]his position would leave § 1997e(a) without any oomph. Wisconsin cannot be unusual in allowing prison officials some authority to entertain untimely complaints and appeals. If the existence of this power means that prisoners need not file timely complaints and appeals, then the incentive that § 1997e(a) provides for prisoners to use the state process will disappear. Prisons are unlikely to entertain many appeals filed a year late, or by prisoners who otherwise thumb their noses at the specified procedures.

*Pozo*, 286 F.3d at 1025. More generally, the Seventh Circuit reasoned that judicial disregard for prison grievance procedures

would allow a prisoner to "exhaust" state remedies by spurning them, which would defeat the statutory objective of requiring the prisoner to give the prison administration an opportunity to fix the problem — or to reduce the damages and perhaps to shed light on factual disputes that may arise in litigation even if the prison's solution does not fully satisfy the prisoner.

286 F.3d at 1023-24 (citations omitted).[3]

Thus, prior to the lead opinion's ruling today, *every court* that has considered the matter has concluded that an untimely grievance which is rejected as such by prison officials does not satisfy the exhaustion requirement of § 1997e(a). Indeed, the lead opinion is unable to identify *any* case in *any* area of the law in which a court has found that an administrative exhaustion requirement was satisfied through an unexcused

---

[3]Still another Circuit, like this one, has addressed the issue of untimely filing only in an unpublished decision. In *Collins v. Federal Bureau of Prisons*, No. 02-1503, 2003 WL 21380545 (10th Cir. June 16, 2003), the Tenth Circuit held that an inmate's "failure to meet the appropriate filing deadlines for administrative remedies constitutes a failure to exhaust those remedies."

filing outside of the governing administrative time limit. Instead, the lead opinion's reasoning rests principally upon the inapposite *Oscar Mayer* decision, with an additional appeal to the Supreme Court's rulings on exhaustion in the context of state prisoner habeas petitions. I turn first to these latter decisions, as they weigh decidedly *against* the conclusion reached in the lead opinion here.

## II.

Whether a state prisoner wishes to bring a § 1983 suit or a habeas petition under 28 U.S.C. § 2254(a) challenging the lawfulness of his confinement, he first must exhaust the relevant set of remedies. The two exhaustion requirements are similarly worded: § 1997e(a) provides that an inmate must exhaust "such administrative remedies as are available," while habeas relief cannot be granted unless an inmate "has exhausted the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A). Accordingly, the Supreme Court precedents as to the latter statute are likely to be instructive in interpreting the former. The lead opinion agrees, citing several of these decisions in support of the result it reaches. I find this utterly remarkable, since the Supreme Court expressly held in one of these cases that a prisoner's untimely filing in state court barred him from seeking habeas relief in federal court.

Specifically, in *Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546 (1991), the Court considered the effect of a death row prisoner filing his state court notice of appeal a mere *three days* after the 30-day deadline imposed by the governing Virginia court rule. In light of this untimely submission, the Virginia Supreme Court dismissed the prisoner's appeal without reaching the merits. The U.S. Supreme Court recognized that the prisoner's delayed filing — a defect legally tantamount to an outright "failure to appeal at all" — was "no doubt" a result of "inadvertent error." *Coleman*, 501 U.S. at 749, 750, 111 S. Ct. at 2564, 2565. Nonetheless, the Court held that federal habeas review was

unavailable as to the claims advanced in the inmate's untimely state court appeal.  501 U.S. at 757, 111 S. Ct. at 2568.

The import of *Coleman* to the question presented here seems plain enough.  In that case, a filing three days past a state court deadline led the Supreme Court to hold that a death row prisoner had forfeited his opportunity to obtain federal court review of the constitutionality of his continued detention and sentence.  The only relevant statutory prerequisite to such habeas relief was that the prisoner must have exhausted the remedies available to him in the state courts.  It readily follows, in my view, that a filing past an administrative deadline presumptively precludes an inmate from establishing the nearly identical statutory prerequisite for commencement of a § 1983 suit.  At a minimum, *Coleman* blunts the force of the lead opinion's contention that a requirement of timely filing would impose too high a cost upon the constitutional rights of prisoners — the stakes obviously were much higher in *Coleman*, implicating the prisoner's asserted right to be free from confinement and an eventual death sentence.[4]

In addition, while the lead opinion relies heavily upon policy arguments gleaned from the Supreme Court's *Oscar Mayer* decision, it barely acknowledges (and largely misconstrues) the much more pertinent policy considerations set forth in *Coleman*.  Having previously held, for example, that a state prisoner's federal habeas suit failed for lack of

---

[4]*Coleman* also undermines the lead opinion's appeal to the presumption that Congress legislates with full awareness of the relevant Supreme Court precedents.  (*See* Lead Op. at 16.)  While I fully accept this proposition, I would suggest that Congress much more likely had *Coleman* than *Oscar Mayer* in mind when it enacted § 1997e(a), a provision which is quite similar to the statute involved in *Coleman*, but which bears absolutely no resemblance to the enactment at issue in *Oscar Mayer*.

timely filing under Fed. R. App. P. 4(a), the *Coleman* Court observed that its ruling had the virtue of

eliminat[ing] inconsistency between the respect federal courts show for state procedural rules and the respect they show for their own.  This Court has long understood the vital interest served by *federal* procedural rules, even when they serve to bar federal review of constitutional claims . . . .  No less respect should be given to state rules of procedure.

*Coleman*, 501 U.S. at 751, 111 S. Ct. at 2565-66 (citations omitted).  More generally, the Court explained that its strict insistence upon exhaustion in the habeas context was "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman*, 501 U.S. at 731, 111 S. Ct. at 2555.  All of this readily carries over to the present context, in light of the Supreme Court's admonition that "prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987) (internal quotations and citation omitted).[5]

---

[5]The lead opinion casually dismisses *Coleman*'s various policy considerations with the observation that "we have never considered a state warden's decision on a grievance to be the equal of a full state court judgment." (Lead Op. at 18.)  Unless we are engaged in some sort of zero-sum game, however, I see no reason to inquire whether the two are entirely equivalent or one is "better" than the other.  It only matters whether both are entitled to some degree of federal court deference, and a vast array of Supreme Court precedent holds that prison officials are entitled to a large measure of deference in the day-to-day operations of their institutions.

In any event, the lead opinion arrives at the wrong answer by asking the wrong question.  Section 1997e(a) is silent on the weight to be given to a warden's decision on the merits in a particular case.  What it does demand, however, is that an inmate present his grievance for the warden's

Nevertheless, through adroit deconstruction, the lead opinion endeavors to show that *Coleman* supports its conclusion here. In particular, the lead opinion focuses on portions (though not the entirety) of the following passage from that decision:

> Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance. A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer "available" to him. In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.

*Coleman*, 501 U.S. at 731-32, 111 S. Ct. at 2555 (citations omitted). From this language, the lead opinion surmises that untimely filing does not directly equate with lack of exhaustion, but that it bars habeas relief only by virtue of the distinct "independent and adequate state ground" or

---

consideration and see the administrative process through to completion before he may proceed to federal court. No one seriously questions the correctness of the warden's decision in this case — no matter how much or how little deference we give, we surely would agree that Thomas's grievance was, in fact, filed several months past the 30-day deadline, and that he has presented no valid excuse for his untimely submission. The relevant question is whether we must respect Ohio's imposition and enforcement of this 30-day deadline. So again, I ask — if we agree to respect a State's judgment that a prisoner must proceed through one or more layers of administrative appeal, why should we balk at the wholly analogous procedural rule at issue here?

---

"procedural default" doctrine. The lead opinion then reasons that no such doctrine has been incorporated into our prisoner § 1983 jurisprudence, leaving us free to follow the "technical" definition of exhaustion cited in *Coleman*.

I find this reasoning wholly unpersuasive, for two reasons. First, to whatever extent *Coleman* can be read as distinguishing between procedural default and exhaustion,[6] this distinction has been obliterated in subsequent Supreme Court habeas decisions. In *O'Sullivan*, *supra*, for example, the Court considered the question whether a state prisoner must petition for discretionary review by a state supreme

---

[6]Even this point is a dubious one. While the lead opinion dutifully recounts a portion of *Coleman*'s historical survey of the independent and adequate state ground doctrine and the procedural default rule, it stops notably short of acknowledging that the federal courts' application of the latter rule in the habeas context rests solely upon "concerns of comity and federalism" — concerns which undoubtedly are present here — and not upon jurisdictional considerations or the need to avoid advisory opinions. *Coleman*, 501 U.S. at 730, 111 S. Ct. at 2554. Thus, it would be misleading to suggest, as the lead opinion appears to do, that the *Coleman* Court felt itself jurisdictionally compelled to adhere to the procedural default rule.

Rather, *Coleman* plainly evidences the Court's recognition of the complementary nature of the exhaustion requirement and the procedural default rule — both are "grounded in principles of comity," and the former would be rendered a nullity without the latter. 501 U.S. at 731-32, 111 S. Ct. at 2554-55. Thus, the Court equated "cases in which a state prisoner fails to exhaust state remedies" and those in which a prisoner "fail[s] to meet the State's procedural requirements for presenting his federal claims" — in either case, the inmate "has deprived the state courts of an opportunity to address those claims in the first instance." 501 U.S. at 732, 111 S. Ct. at 2555. Moreover, the Court invoked the procedural default rule to ensure that prisoners did not "avoid the exhaustion requirement by defaulting their federal claims in state court," 501 U.S. at 732, 111 S. Ct. at 2555 — precisely the reasoning which the various Courts of Appeals have employed in resolving the issue now before us, yet which the lead opinion summarily rejects as contrary to the purported views of the Supreme Court and the "meaning of exhaustion," (Lead Op. at 18).

court in order to satisfy the exhaustion requirement. In answering in the affirmative, the Court noted the "interplay" between the doctrines of exhaustion and procedural default, once again explaining (as it had in *Coleman*) that "a prisoner could evade the exhaustion requirement — and thereby undercut the values that it serves — by letting the time run on state remedies." *O'Sullivan*, 526 U.S. at 848, 119 S. Ct. at 1734 (internal quotations and citation omitted). The Court then elaborated:

> To avoid this result, and thus protect the integrity of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.,* whether he has fairly presented his claims to the state courts. Our disagreement with [the dissent] in this case turns on our differing answers to this last question: Whether a prisoner who fails to present his claims in a petition for discretionary review to a state court of last resort has *properly* presented his claims to the state courts. Because we answer this question "no," we conclude that [state prisoner] Boerckel has procedurally defaulted his claims.

526 U.S. at 848, 119 S. Ct. at 1734 (internal quotations and citations omitted).

Apart from this express statement that the procedural default doctrine is a necessary component of the exhaustion rule, the Court interchangeably referred to the prisoner's failure in that case as a lack of exhaustion and a procedural default.[7]    Because Illinois authorizes petitions for

---

[7] Indeed, the dissent's chief complaint in *O'Sullivan* was that the Court's opinion "confuse[d]" the two "analytically distinct" rules of exhaustion and procedural default. 526 U.S. at 850, 119 S. Ct. at 1735 (Stevens, J., dissenting). Even the dissent recognized, however, that the procedural default doctrine was "crafted" by the Court "[i]n order to protect the integrity of our exhaustion rule." 526 U.S. at 853, 119 S. Ct.

discretionary review by that State's highest court, the Supreme Court reasoned that this was an "available" remedy which prisoner Boerckel was obliged to exhaust before seeking habeas relief in federal court. Boerckel fell short of this exhaustion requirement, however, by virtue of his failure to include three of his federal claims in his petition to the Illinois Supreme Court. Moreover, because the "time for filing such a petition ha[d] long passed," the Court held that "Boerckel's failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims." *O'Sullivan*, 526 U.S. at 848, 119 S. Ct. at 1734. Under this reasoning, the notions of exhaustion and procedural default are merged, and an inmate's failure to properly pursue a state remedy in accordance with the relevant procedural requirements can just as well be termed a lack of exhaustion or a procedural default. It follows, in particular, that an outright failure to file is legally indistinguishable from a submission beyond the state's filing deadline.

But perhaps even more to the point, and closer to home, the Supreme Court recently rejected this Circuit's continued recognition of a distinction between exhaustion and procedural default in the habeas context. In *Carpenter v. Mohr*, 163 F.3d 938, 944 (6th Cir. 1998), we had held that the District Court had "erroneously conflated the exhaustion requirement with the procedural default or waiver rule," thereby merging two inquiries which were "analytically distinct." In language which bears a striking similarity to the lead opinion's reasoning in this case, we stated that "the exhaustion requirement is satisfied even if a claim was procedurally defaulted in state court, because in such cases there are no longer remedies available for the petitioner to exhaust." *Carpenter*, 163 F.3d at 944 (citing *Coleman* and other cases).

---

at 1736-37 (Stevens, J., dissenting).

The Supreme Court reversed. *See Edwards v. Carpenter*, 529 U.S. 446, 120 S. Ct. 1587 (2000). The Court deemed it "not a hard question" whether it suffices to merely "present" a claim to the state courts, "even though it was not presented in the manner that state law requires." 529 U.S. at 452, 120 S. Ct. at 1591-92. An affirmative answer to this question, in the Court's view, "would render [the] exhaustion requirement illusory." 529 U.S. at 452, 120 S. Ct. at 1592 (footnote omitted). The Court then continued:

> We recognized the inseparability of the exhaustion rule and the procedural default doctrine in *Coleman . . . .* We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan . . . ,* concluding that the latter doctrine was necessary to "'protect the integrity' of the federal exhaustion rule." ***The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by "'letting the time run'" so that state remedies were no longer available. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it.*** In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "*fair* 'opportunity to pass upon [his claims].'"

529 U.S. at 452-53, 120 S. Ct. at 1592 (emphasis added) (citations omitted).

Under federal habeas law, then, all that remains of any distinction between the exhaustion and procedural default rules is different terminology and separate historical lineages. While it is true that the Supreme Court had to make a choice whether to merge these two doctrines, the Court has readily

and repeatedly recognized the practical necessity of this merger — absent a procedural default component, the exhaustion requirement would be a nullity. Likewise, our sister Circuits — as well as this Circuit, albeit in unpublished decisions — have found it necessary to construe the exhaustion rule of § 1997e(a) as encompassing procedural default through untimely administrative filing.

The lead opinion and concurrence insist that this reading of § 1997e(a) is improper, however, because it would add a timeliness requirement to the statute that Congress purportedly has declined to impose. To this contention, I can only respond that the Supreme Court presumably did not view itself as legislating when it adopted a similar construction of the habeas exhaustion statute, 28 U.S.C. § 2254(b)(1)(A). Indeed, if it would be improper for a court to erect additional obstacles to a prisoner suit under § 1983, it would be all the more problematic for the courts to restrict their congressionally-conferred and constitutionally-mandated authority to entertain prisoner habeas petitions. But this is not what the Supreme Court has done, or what our sister Circuits have done, in insisting that prisoners comply with applicable deadlines and other procedural requirements — to the contrary, they have ensured that the congressional mandate of exhaustion is preserved rather than subverted, by construing exhaustion in the only way that makes sense.[8]

---

[8] Judge Gilman's concurrence rests entirely on the proposition that my approach would effectively amend Congress's statutory mandate of exhaustion by incorporating a requirement of timely filing. Certainly, this charge of "judicial activism" would apply as well to the three other Circuits which have adopted the reading of § 1997e(a) that I favor — and, as noted, it would apply as well to the Supreme Court's habeas decisions. But Judge Gilman's analysis merely begs the question, in my view. I freely acknowledge, as did the Supreme Court in *Coleman*, that a prisoner exhausts his remedies in a "technical" sense once there are no more administrative avenues to pursue, whether because of a procedural default or for any other reason. The question we confront here is whether the congressional mandate is satisfied through such "technical" exhaustion, or whether § 1997e(a) demands something more from prisoners.

Next, even assuming that some meaningful distinction

_____

As a matter of brute semantics, I do not deny that the "technical" definition of exhaustion favored by my colleagues is a permissible one. For all of the reasons outlined herein, however, I simply do not believe that this is the meaning Congress intended in enacting the PLRA. Judge Gilman has succinctly stated one of my reasons — that, in cases such as this one, a requirement of mere "technical" exhaustion results in the federal courts having "to deal with the § 1983 issues without the benefit of the state's administrative consideration on the merits." (Concurring Op. at 25.) While Judge Gilman states that such cases "make[] the issue difficult" for him, (*id.*), they make it *easier* for me to conclude that Congress could not have intended a definition of exhaustion that routinely permits claims to reach the federal courts without the benefit of any prior consideration on the merits. Under such circumstances, I find it unnecessary to await a legislative declaration that § 1997e(a) mandates actual, meaningful, and not merely "technical" exhaustion.

Yet, because it is possible to define exhaustion in a purely "technical" sense, my charges of "judicial meddling" do not rest upon any notion that my colleagues have "rewritten" § 1997e(a). Rather, my quarrel is with the analytical route by which they arrive at their reading of this statute. Judge Gilman's concurrence makes the argument, for example, that the Supreme Court's habeas decisions do not compel any particular result here, because the "inseparability of the exhaustion rule and the procedural-default doctrine" in the habeas context, *Edwards*, 529 U.S. at 452, 120 S. Ct. at 1592, does not require that we place a similar procedural-default gloss upon § 1997e(a). Very well, but this does not deny the force of (or even address) my argument that all of the same grounds relied upon by the Supreme Court in *Coleman*, *O'Sullivan*, and *Carpenter* are fully applicable here, and therefore should lead us to construe exhaustion under § 1997e(a) in the same way that exhaustion has been interpreted in habeas cases. It is evidence of judicial activism, in my view, to resolve an issue as though writing on a blank slate, and to deny the clear import of closely analogous decisions.

The remaining bases for my concerns of judicial policymaking are set forth throughout this opinion and need not be repeated here. I do wish to emphasize one point, however — that, no matter how many times my colleagues appeal to "Supreme Court precedent," (Lead Op. at 2-3; Concurring Op. at 27), they simply cannot identify a single case, whether under § 1997e(a) or in any other statutory or administrative context, in which that Court (or any other) has held that an exhaustion requirement was satisfied through an unexcused filing beyond an applicable deadline.

might remain between procedural default and exhaustion, it is far too late in the day to contend that the former doctrine should not apply in the context of § 1997e(a), and that the purely "technical" definition of exhaustion instead should control. At the risk of redundancy, I again point out that this Circuit **already** has held that certain types of procedural defaults — *e.g.,* a failure to pursue all available avenues of administrative appeal — constitute lack of exhaustion under § 1997e(a). To the Supreme Court, at least, a late filing and an outright failure to file at all are both analyzed in precisely the same way — namely, as procedural defaults. *See O'Sullivan*, 526 U.S. at 848, 119 S. Ct. at 1734; *Coleman*, 501 U.S. at 750-52, 111 S. Ct. at 2565-66. Thus, while one might seek to distinguish between these two forms of default — although, as discussed below, I am wholly unpersuaded by the lead opinion's attempts at such a distinction here — it is untenable to suggest that procedural defaults generally do not run afoul of § 1997e(a)'s exhaustion requirement. Rather, it is now the law of this Circuit that **some** procedural defaults, but not others, bar a prisoner suit under § 1983.

### III.

In my view, the above-cited authorities point uniformly and unmistakably toward the conclusion that timely filing is a necessary component of exhaustion under § 1997e(a) in all but the most unusual of circumstances. Even if we were writing on a blank slate, however, I could not subscribe to the policy judgments made in the lead opinion. Rather, I believe that the lead opinion's analysis of untimely prisoner grievances substitutes superficial straw-men for careful scrutiny, and rests upon a fundamental misunderstanding of the significance of administrative filing deadlines.

Throughout its entire discussion of the timeliness issue, the lead opinion acknowledges only a single argument in support of the rule that inmates presumptively must comply with administrative time limits. In particular, the lead opinion proclaims that "the only ground for barring a federal § 1983

suit due to an untimely prison grievance is that we would otherwise render prison grievance procedures irrelevant." (Lead Op. at 18.) The lead opinion confidently assures us that this will not occur, however — inmates "will still have every incentive to raise their grievances within the prison's timelines, because it is in the prison grievance process that inmates will, for most practical purposes, receive their swiftest and most effective remedies." (*Id.* at 19.)

The various policy-based considerations that lurk beneath the surface of this analysis thwart the considered judgment and expressed will of Congress when it enacted § 1997e(a) in its present form. First and foremost, Congress did not legislate a system of "incentives" for prisoners to pursue their administrative remedies — it commanded in the most explicit of language that inmates **must exhaust** these remedies in **all cases.** In this case, for one, this simply did not occur — because of Thomas's untimely filing, there was no administrative consideration whatsoever of the merits of his grievance, let alone exhaustion of the prison's dispute resolution process. Moreover, even before today's ruling, Thomas, for one, apparently failed to perceive any incentive to timely file his grievance — he submitted it five months past the 30-day limit, despite the admitted absence of any impediment to meeting this deadline. I find little comfort, then, in the lead opinion's prediction that its rule will not thoroughly undermine the congressional command of exhaustion. It is bad enough, in my view, that some prisoners undoubtedly **will** take advantage of our free pass to circumvent this requirement.

Further, Congress made no secret of its principal concern in making exhaustion mandatory. This Court and others have amply recounted the legislative history leading up to the 1996 amendment of § 1997e(a). We recently observed:

"Congress was primarily concerned about the rising number of lawsuits filed by prisoners and the perception that most of these suits were frivolous." *Cruz v. Jordan,*

80 F. Supp.2d 109, 113 (S.D.N.Y. 1999). *See, e.g.,* 141 Cong. Rec. S14408-01, *S14414 (daily ed. Sept. 27, 1995) (statement of Senator Dole) (noting that prisoner suits increased from 6,600 in 1975 to over 39,000 in 1994 and included claims for "insufficient storage locker space, a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and . . . being served chunky peanut butter instead of the creamy variety."); 141 Cong. Rec. S7498-01, *S7526 (daily ed. May 25, 1995) (statement of Senator Kyl) (stating that in 1994, prisoners brought more than one-fourth of all civil suits filed in the United States District Courts); Bernard D. Reams, Jr & William H. Manz, *A Legislative History of the Prison Litigation Reform Act of 1996,* Pub. L. No. 104-134, 110 Stat. 1321, Doc. 33, at 61 (noting that the short title given to the House measure containing the PLRA was "Stopping Abusive Prisoner Lawsuits").

*Cox v. Mayer*, ___ F.3d ___, 2003 WL 21340291, at *3 (6th Cir. June 11, 2003); *see also Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir. 1999) ("The 1996 Act is designed to deter frivolous lawsuits . . . ."). Likewise, the Eleventh Circuit has explained:

Congress enacted this mandatory exhaustion requirement in section 1997e(a) as part of the PLRA's effort to curtail frivolous and abusive prisoner litigation . . . . Congress did not enact the PLRA in a vacuum. It held hearings and rendered findings, concluding that prisoners file more frivolous lawsuits than any other class of persons. Congress found that the number of prisoner lawsuits has grown astronomically . . . . Congress intended section 1997e(a) to curtail the ability of prisoners to bring frivolous and malicious lawsuits by forcing prisoners to exhaust all administrative remedies before bringing suit in Federal court.

*Alexander v. Hawk*, 159 F.3d 1321, 1324 (11th Cir. 1998) (internal quotations and citations omitted).

This recognition is notably lacking in the lead opinion's wishful thinking on incentives. The inmates least likely to adhere to a prison's time limits and other procedural rules are precisely those prisoners who are pursuing frivolous or abusive claims. Such prisoners, after all, would have nothing to lose in flouting prison procedures, because they would have no legitimate expectation of obtaining any remedy through the prison's grievance process. For such prisoners, it matters only that they reach the finish line of this process and secure their ticket to federal court, and today's ruling provides a handy shortcut for doing so. Thus, by presuming that inmates will pursue their administrative remedies in good faith, even if this Court does not insist that they do so, the lead opinion disregards the finding of Congress that prisoners all too often were ***not*** acting in good faith, and the judgment of Congress that this problem could best be addressed through a requirement of mandatory exhaustion.

Yet, as much as the lead opinion is prepared to assume that prisoners act in good faith, it is quite unwilling to make the same assumption about prison officials. Tellingly, in assessing the potential costs of its ruling and identifying the "one ground" that might militate against it, the lead opinion utterly fails to even allow for the possibility that prison officials might have good reasons for establishing deadlines for the filing of grievances. Even a moment's thought, however, would reveal several such reasons, including: (i) the inherent benefit of prompt investigation, while memories are still fresh and all involved inmates and prison employees remain at the facility;[9] (ii) the desire to bring the entire matter, including all available internal appeals, to a

---

[9]In this case, by contrast, inmate Thomas already had transferred to another institution by the time he filed his grievance.

conclusion within a reasonable time period;[10] and (iii) the greater likelihood that a prisoner might be satisfied by swift action against any transgressors.[11] Significantly, most of these benefits accrue to prisoners and prison officials alike — and this presumably is why prison officials routinely impose deadlines upon themselves as well as inmates. On the assumption that the 30-day time limit in this case was motivated by these and other legitimate considerations of efficient and effective institutional functioning — and, again, the record contains no suggestion whatsoever to the contrary — I would hold that this deadline is presumptively entitled to our respect, with exceptions made only in those cases where an inmate establishes his inability to comply with a prison's filing limit.[12]

All of these benefits are lost, however, when deadlines are reduced to mere suggestions. To be sure, there may be some cases in which both sides act in enlightened good faith, and voluntarily agree to move promptly through the stages of the administrative process. As we judges well know, however,

---

[10]To the extent that the process is prolonged, of course, this leaves the courts to deal with stale claims and an outdated record.

[11]Indeed, in its discussion of prisoner incentives, the lead opinion cites the capacity of the prison grievance process to provide the "swiftest and most effective remedies." (Lead Op. at 19.) This capacity rests in no small part upon the proper functioning and enforcement of deadlines.

[12]To be sure, the lead opinion pays lip service to the "mutually beneficial" value of deadlines to both prisoners and prison officials. (Lead Op. at 19 n.4.) It quickly reverts to form, however, speculating without any discernable basis as to a purportedly "real concern" that "prison administrators will impose shorter and shorter deadlines measured in hours and days" in order to shut prisoners out of federal court. (*Id.*) Since several other Circuits have adopted the procedural default doctrine that so concerns the lead opinion, one would expect to see prison administrators within those Circuits busily shortening their filing deadlines and setting other sorts of procedural traps. To my knowledge, this has not occurred.

litigation is more often adversarial than collegial, and any process which results in winners and losers is likely to invite strategic behavior. Procedural rules, it seems to me, are designed to avoid worst cases and limit strategic behavior, while imposing no special hardship upon those who would proceed in good faith even in their absence. As noted at the outset, I see no indication that inmates generally have found it difficult to meet prison filing deadlines, particularly in light of the modest effort involved in filing a grievance.[13]

In contrast, the worst cases invited by the lead opinion's rule promise to be very bad indeed. A prisoner who wishes to avoid the exhaustion requirement now has every incentive to wait as long as possible before filing a grievance, in order to enhance the likelihood that his submission will be rejected as untimely. The outer bound for this delay presumably is the statute of limitations for § 1983 suits[14] — and not one day earlier, because this limitation period is immediately tolled upon the commencement of administrative proceedings. *See Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000). It is highly disingenuous, in my view, to insist that prison officials still have a meaningful "opportunity" to address the merits of such an intentionally delayed grievance. Rather, as the Supreme Court has explained, even if it could be said that the prisoner had technically "exhausted" his remedies, it could not seriously be contended that "the State had been given a *fair* opportunity to pass upon" the prisoner's claims.

*Edwards*, 529 U.S. at 453, 120 S. Ct. at 1592 (internal quotations and citation omitted).[15]

Then, after this prolonged but essentially worthless administrative process has finally reached its conclusion, the courts would be left to address claims which have gone stale, and which in most cases have never been addressed on the merits, but which nonetheless have been fully "exhausted" as the lead opinion construes that term. Alternatively, in cases which do not meet even this lenient notion of "exhaustion," a court's dismissal without prejudice under § 1997e(a) often will be only the beginning of the process, rather than the end. Armed with the court's "blueprint" for the administrative steps that should have been taken but were not, an inmate may go back and fix his prior administrative filings, unimpeded by the expiration of any administrative deadlines. This process may be repeated as necessary, limited only by the running of the underlying statute of limitations for § 1983 suits — which, again, is tolled during administrative proceedings, and likely during judicial proceedings as well. As noted at the outset, this eviscerates many of our prior failure-to-exhaust decisions — an inmate who, for example, did not pursue all available administrative appeals can now pick up the process where he left off, undeterred by any missed filing deadlines.

Or consider this very case, in which we hold that Thomas's grievance setting forth his claims against Defendant Shawn Woolum did not serve to exhaust his claims against the remaining Defendants. I see nothing to prevent Thomas from

---

[13]In this case, for example, Thomas requested a grievance form on May 1, 1998, was given the form two days later, on May 3, and was able to file his grievance the next day, on May 4, 1998. This grievance was a handwritten one-page document, setting forth the factual basis for Thomas's complaints and the various remedies he was seeking.

[14]As noted in the lead opinion, this is two years in Ohio.

[15]Even more puzzling is the lead opinion's assertion that a state may "avoid federal court" by "waiving [its] procedural guidelines." (Lead Op. at 11.) Just how state officials might accomplish this is not explained. In fact, a state that elects to address an untimely grievance might very well still find itself in federal court, unless it resolves the grievance in a way that totally satisfies the inmate. This is highly unlikely in the frivolous and abusive cases that Congress specifically targeted in enacting the PLRA.

going back and filing grievances against these other parties, advancing the failure-to-protect theory that he did not assert in his initial grievance. To be sure, these new grievances would come almost six years after the incident in question — but this no longer matters, so long as the underlying two-year statute of limitations has not run in light of the pendency of various administrative and judicial proceedings.[16] Prison officials still would have the "opportunity" to address these new grievances, and this is all that today's ruling requires from an inmate in order to exhaust his remedies. Although this strikes me as the height of absurdity, my colleagues on the panel unfortunately do not share in this view — nor, indeed, do they even acknowledge the concern.

## IV.

Against the foregoing weight of authority and reason in favor of the judiciary's presumptive respect for administrative filing deadlines, the lead opinion offers up the Supreme Court's *Oscar Mayer* decision as singlehandedly compelling the opposite result. Indeed, it appears that the lead opinion must cast its lot with *Oscar Mayer*, because no other case of which I am aware supports its view of exhaustion as mere termination by any means. Yet, even the most cursory review reveals that *Oscar Mayer* has nothing whatsoever to say about administrative exhaustion or the proper construction of § 1997e(a). Thus, the lead opinion is left adrift without an anchor.

In *Oscar Mayer*, the Supreme Court addressed a lengthy, detailed, and highly idiosyncratic provision of the Age Discrimination in Employment Act ("ADEA"), requiring that a person must "commence[]" state proceedings at least sixty days before bringing a federal age discrimination suit:

---

[16] I express no view on the proper outcome of this inquiry in this case.

In the case of an alleged unlawful practice occurring in a State which has a law prohibiting discrimination in employment because of age and establishing or authorizing a State authority to grant or seek relief from such discriminatory practice, no suit may be brought under section 626 of this title before the expiration of sixty days after proceedings have been commenced under the State law, unless such proceedings have been earlier terminated . . . . If any requirement for the commencement of such proceedings is imposed by a State authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State authority.

29 U.S.C. § 633(b). Upon reviewing the language of this statute, the Supreme Court held, among other things, that a grievant is not required to commence state proceedings within the time limits specified by state law in order to preserve his federal right of action. *See Oscar Mayer*, 441 U.S. at 753, 99 S. Ct. at 2070.[17]

Although the lead opinion recites various policy considerations noted by the Court in reaching this decision, the ruling in *Oscar Mayer* rests first and foremost on the language of the statute itself. Initially, the Court observed that the use of the word "commenced" does not necessarily demand compliance with state filing deadlines, "since, by way of analogy, under the Federal Rules of Civil Procedure even a time-barred action may be 'commenced' by the filing

---

[17] As noted in the lead opinion, the Court reached essentially the same conclusion in *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 108 S. Ct. 1666 (1988), a case involving a nearly identically worded provision in Title VII, 42 U.S.C. § 2000e-5(c). Because this ruling and *Oscar Mayer* rest upon virtually the same statutory language and reasoning, I have confined my discussion only to the latter decision.

of a complaint." 441 U.S. at 759, 99 S. Ct. at 2073 (citations omitted). The Court then found that any ambiguity on this point was overcome by the statute's **express definition** of what constitutes "commencement" — namely, the "filing of a written and signed statement of the facts upon which the proceeding is based," and nothing else. 441 U.S. at 760, 99 S. Ct. at 2073 (quoting 29 U.S.C. § 633(b)). Thus, the Court explained, "even if a State were to make timeliness a precondition for commencement . . . , a state proceeding will be deemed commenced for purposes of [the federal statute] as soon as the complaint is filed," and irrespective of any state filing limits. 441 U.S. at 760, 99 S. Ct. at 2073.

The lead opinion does not address, or even acknowledge, this principal basis for the decision in *Oscar Mayer*. The statute in that case defined "commencement," and decreed that the states could not impose any requirements for "commencement" beyond the bare filing of a statement of facts.[18] Section 1997e(a), in contrast, supplies no special definition of exhaustion. It seems reasonable to assume, then, that Congress meant for prisoners to "exhaust" their remedies under § 1997e(a) in precisely the same way that they must "exhaust" their remedies under 28 U.S.C. § 2254(b)(1)(A). Under the Supreme Court's then-recent decision in *Coleman*, such exhaustion entailed compliance with a state's procedural rules, including filing deadlines. More generally, through its enactment of the PLRA, Congress could hardly have meant to relax the standards for a prisoner to exhaust his administrative remedies, or to invite creative schemes for avoiding this mandatory requirement.

---

[18]Notably, in giving effect to this plain statutory language, the Supreme Court observed that this was the "prevailing interpretation" adopted by the courts, as well as the interpretation adopted by the EEOC. *Oscar Mayer*, 441 U.S. at 760-61, 99 S. Ct. at 2074. This latter construction, of course, was "entitled to great deference" by the courts. 441 U.S. at 761, 99 S. Ct. at 2074 (internal quotations and citation omitted). Here, by contrast, no court or other authority whatsoever has previously endorsed the lead opinion's interpretation of § 1997e(a).

Other portions of *Oscar Mayer* also demonstrate its inapplicability here. The Court emphasized, for instance, that the ADEA provision at issue "***does not stipulate an exhaustion requirement***," but "is intended only to give state agencies a limited opportunity to settle the grievances of ADEA claimants in a voluntary and localized manner so that the grievants thereafter have no need or desire for independent federal relief." 441 U.S. at 761, 99 S. Ct. at 2074 (emphasis added). Congress set the bar a good deal higher in § 1997e(a), of course — this provision **does** mandate exhaustion, and prison officials have been granted far more than a "limited opportunity" to address prisoner grievances. As noted earlier, Congress meant for this exhaustion requirement to staunch the flow of frivolous and abusive prisoner litigation, a concern which in no way animated the enactment of the provision at issue in *Oscar Mayer*.

More generally, *Oscar Mayer*'s express disavowal of any consideration of exhaustion principles presumably explains why, so far as I can tell, that decision has **never** been cited outside of its peculiar ADEA/Title VII context as any sort of authority on the meaning of administrative exhaustion. Indeed, *Oscar Mayer* does not state a rule of general applicability to administrative exhaustion even in the narrow context of employment discrimination law. In particular, the courts **do** insist that grievants comply with administrative time limits in order to pursue their employment discrimination claims in federal court. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S. Ct. 1127, 1132 (1982). In a decision affirming the dismissal of a case in which a *pro se* plaintiff missed a Title VII filing deadline, the Supreme Court emphasized that "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152, 104 S. Ct. 1723, 1726 (1984). Although doctrines such as equitable tolling might excuse an untimely filing in a particular case, we have cautioned that such relief is "sparingly bestow[ed],"

and that "[a]bsent compelling equitable considerations, a court should not extend limitations by even a single day." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560-61 (6th Cir. 2000).[19]

I fail to see why we should favor the civil rights claims of prisoners over those of law-abiding citizens. In fact, the lead opinion's rule creates precisely the dilemma the Supreme Court sought to avoid in *Coleman* — in this Circuit, we respect federal procedural rules in employment discrimination cases, but not state procedural rules in prisoner § 1983 suits. Neither *Oscar Mayer* nor any other authority supports such a result.

### V.

In the end, the lead opinion's ruling on the issue of timeliness rests upon a smattering of policy-based observations in *Oscar Mayer*, wholly unmoored from the specific statutory context in which the Supreme Court ruled in that case. This is a far cry from the lead opinion's initial promise to resolve this question "in light of Congress's purpose in passing the PLRA," (Lead Op. at 3) — which purpose the lead opinion then proceeds to discount — and in light of the Supreme Court's exhaustion precedents — which, as noted, recognize timeliness as an essential element of exhaustion. It is a strange form of "[j]udicial restraint," (Lead Op. at 19-20 n.4), in my judgment, which reaches out to decide an unnecessary issue in a way that invites prisoners to circumvent the congressional mandate of exhaustion.

---

[19]In light of these precedents, I am at a loss to see how the lead opinion can claim that no "procedural default hurdles" stand in the way of a Title VII or ADEA litigant. (Lead Op. at 11 n.2.) Whether or not the courts employ the terminology of "procedural default" in such cases, the brute fact remains that individuals who miss administrative deadlines generally forfeit their right to call upon the "federal courts as a vindicator of federal rights." (*Id.*)

As explained above, I believe that the relevant policy considerations militate strongly against the rule adopted by the lead opinion in this case. More importantly, the lead opinion's willingness to dispense with administrative filing deadlines runs counter to the strict exhaustion requirement of § 1997e(a), the intent of Congress in imposing this mandatory prerequisite to prisoner suits under § 1983, and the decisions of this and other Courts of Appeals uniformly holding that inmates must comply with a prison's procedural rules as they exhaust their administrative remedies. Accordingly, while I concur in the Court's judgment affirming the District Court, I dissent from the lead opinion's ruling that untimely grievances satisfy the administrative exhaustion requirement of § 1997e(a).